CASE 80—PETITION EQUITY—JUNE 20

# Leonard et al v. Braswell et al.

APPEAL FROM LYON CIRCUIT COURT.

1. DESCENT AND DISTRIBUTION—RIGHT OF THE ISSUE OF VOID MARRIAGE TO INHERIT.—Under the provision of the Kentucky Statute that "the issue of an illegal or void marriage shall, nevertheless, be legitimate," although the marriage was consummated in a State under the laws of which the marriage was void and the issue therefrom illegitimate, the issue of such a marriage may inherit property in Kentucky from their parents and collateral kindred.

2. STATUTORY CONSTRUCTION.—A subsequent section of the statute relative to void marriages which provides that "where the marriage is contracted in good faith, and with the belief of the parties that a former husband or wife then living was dead, the issue of the marriage born or begotten before notice of the mistake, shall be legitimate issue of both parties," does not qualify the previous provision that the issue of an illegal or void marriage shall be legitimate.

L. D. HUSBANDS FOR APPELLANTS.

1. While the State of Kentucky may pass laws of descent and distribution, it is not within the domain of her sovereign power to add to or enlarge the scope or operation of the marriage laws of another State; it takes a marriage in a State whose laws say the issue of such marriage shall be legitimate, to make a legitimate child, and the marriage claimed under by the appellees was absolutely null and void, under the laws of the State where it was consummated. (Kent's Com., vol. 2, side pages 91, 92, 93; Story's Com. Laws, secs. 80a, 81, 87a, 93, 93b, 93d, 93e, 93q, 105, 113, 121; Bishop on Marriage and Divorce, sec. 126, 144, 146; Stevenson v. Gray, 17 B. M., 203.)

2. The law of the State where the marriage is celebrated not only governs and determines the validity or invalidity of the marriage

Leonard et al v. Braswell et al.

itself, but it also governs, determines and fixes the status of the·
issue of the marriage, and necessarily determines whether the.
issue of such marriage is legitimate or illegitimate; the laws of'
other sovereignties can not affect that question.  (Smith v. Kelly,.
23 Miss. (55 Amer. Dec., 87); McDeed v. McDeed, 67 Ill., 547; Van
Vorhees v. Brintnall, 86 N. Y., 18; M. & B. Statutes of Ky., vol. 1,
p. 565 and vol. 2, p. 1157.)

3. The provisions of article 1, chapter 47 of the Revised Statutes, title.
Husband and Wife, and the subsequent revisions of the same, em--
bracing sections 1 to 19 inclusive, have no application whatever·
to any marriages or the issue of any marriages other than *Ken-
tucky marriages*.  The legislature could not regulate, and did not.
intend to attempt to regulate foreign marriages or the status of'
the issue of foreign marriages.  (Com. v. City of Lexington, 12 B..
M., 223; Endlich on Interpretation of Statutes, sec. 174; United
States v. Palmer, 3 Wheaton, 630; 23 Amer. & Eng. Enc. of Law,
pp. 346-7-8; Van Vorhees v. Brintnall, 86 N. Y., 18; Bishop on
Marriage and Divorce, sec. 144.)

4. Evidence of co-habitation, recognition, etc., is competent to prove
a marriage in a civil suit.  (Sneed v. Ewing, 5 J. J. M., 491; 2,
Greenleaf's Evidence, sec. 462; Fenton v. Reed, 4 Johnson, 54;
Taylor v. Shemwell, 4 B. M., 577; Crozier v. Gano, 1 Bibb, 257;
Stoner v. Boswell, 3 Dana, 232; Donelly v. Donelly, 8. B. M., 116.)

5. The provisions of section 4 of the statute meant to qualify some--
thing that was in the third section; that is the legislature intended'
to make the issue of felonious bigamous marriages illegitimate if
the parties married with the guilty knowledge that the former hus-
•band or wife was living and not divorced.  (Sams v. Sams, 85 Ky.,.
396; Phillips v. Pope, 10 B. M., 172.)

F. A. WILSON and J. G. HUSBANDS on same side.

1. While the validity of the Illinois marriage, and the legitimacy of
the issue of that marriage, are governed solely by the laws of the·
that State, yet even under the statute law of Kentucky if the mar-
·riage had been solemnized in Kentucky, it would have been biga-·
mous, null and void, and the issue thereof illegitimate, because
prior to the begetting of such issue, both Braswell and his so-
called second wife knew well the former legal wife was living.

2. A marriage under an assumed name is just as valid for every pur-
pose as if it had been under the right name; and one may be pun-
ished for bigamy where the bigamous marriage is contracted un-
der an assumed name, just as if contracted under the true name,
and, therefore, it is immaterial that Braswell's first marriage·

Leonard et al v. Braswell et al.

was under an assumed name. (Amer. & Eng. Enc. of Law, vol. 16, p. 119, and vol. 2, p. 193; Com. v. Robinson, 6 Bush, 309.)

3. The true rule for the construction of statutes is to look to the whole and every part of the statute and to the apparent intention derived from the whole; to the subject matter; to the effect and consequences, and to the reason and spirit of the law, though the meaning so ascertained conflicts with the legal sense of the words. Effect should be given to each clause when it can be done, but one clause may be enlarged or limited by other provisions on the same subject. (Ryegate v. Wardsboro, 30 Vt., 745, cited in note in vol. 23, p. 307, Amer. & Eng. Enc. of Law; Kent's Com., vol. 1, side page, 462; San Diego v. Gravins, 77 Cal., 511, cited in note in Amer. & Eng. Enc. Law, vol. 23, pp. 309-10.)


WM. H. HOLT on same side.


1. The *lex loci contractus* determines not only the validity of the marriage, but the legitimacy of the issue, and while each sovereign State may make its own laws of descent and distribution, it has no right to say what shall be a valid marriage in another State, or fix the status of the issue of such a marriage. (Story's Conflict of Laws, secs. 80a, 93b, 93e, 93q, 105, 113, 121; McDeed v. McDeed, 67 Ill., 545; Stephenson v. Gray, 17 B. M., 193; Sams v. Sams, 85 Ky., 396; Smith v. Kelley, 23 Miss., 167.)

2. While the law of Illinois must determine the validity of the marriage in this case and the status of the issue thereof, yet even under the Kentucky Statute the marriage was void 'and the issue illegitimate because the mother knew the father had another wife living before the issue was begotten.(Gen. Stats., chap. 52, sec. 4.)

3. Section 6 of the act under consideration recognizes the *jus gentium* as a part of the law of this State, and the act when considered and construed as a whole was manifestly only intended to apply to Kentucky marriages. The presumption is that it was not intended to have extraterritorial operation.


JAMES & JAMES for appellees.


1. The alleged marriage of Charles Braswell under the name of Charles Dobbins to Susan Beloate in Memphis or elsewhere, is not established by the evidence. That was the finding of the lower court, the judge of which knew all the parties and the witnesses, and his finding ought not to be disturbed, "unless flagrantly and palpably wrong and erroneous."

2. But if the Memphis marriage was established and it was shown that Braswell, while his first wife was living and without being divorced married again, and that the appellees are the issue of the last marriage, still under the Kentucky Statute, they are legitimate and capable of inheriting and transmitting inheritance. Section 2098, Kentucky Statutes, provides that "the issue of an illegal or void marriage shall be legitimate," and this has been the law of Kentucky since 1796, having been brought down to the present through all the revisions of our statute law and has been construed by the courts. (Littell's Digest, chap. 60, title Descent and Distribution, pp. 435-6-7; Gen. Stats., p. 716; Kentucky Stats., sec. 2098; Harris v. Harris, 8 Ky. L. R., 727; Sneed v. Ewing, 5 J. J. M., 460; Workman v. Harold, 8 Ky. L. R., 605; Amer. & Eng. Enc. of Law, vol. 2, p. 142.)

3. N. T. Braswell having died a resident of and domiciled in Kentucky, the laws of descent and distribution of Kentucky must control in the distribution of his personal estate; and all his real estate being situated in Kentucky, its laws must control the distribution thereof. (Sneed v. Ewing, 5 J. J. M., 476; United States v. Crosby, 7 Cranch, 115; Clark v. Graham, 6 Wheaton, 577; Amer. & Eng. Enc. of Law, vol. 24, pp. 363 and 425.)

T. J. WATKINS FOR APPELLEE T. A. BRASWELL.

1. The burden rests upon appellants to establish the marriage in Memphis between Braswell and Miss Beloate; and the court should not bastardize the issue of his subsequent marriage, unless the first marriage is established by such convincing and conclusive evidence as would have convicted Braswell of bigamy if tried on that charge.

2. Even if the evidence was conclusive that Chas. Braswell had a living wife, from whom he had not been divorced, at the time of his marriage to Josephine Doom, still under the statute law of Kentucky "the issue of an illegal or void marriage shall be legitimate," and this statute relates *alone* to the descent and distribution of property, and applies to the issue of *all* marriages, whether contracted in Kentucky or elsewhere. (Act of Va. Legislature, 1785; Act Ky. Legislature, 1796; 1 Stat. Law, 561; Sneed v. Ewing, 5 J. J. M., 460; Jackson v. Moore, 8 Dana, 170; Newcomb v. Newcomb, 13 Bush, 544; Workman v. Harold, 8 Ky. L. R., 605; Harris v. Harris, 85 Ky., 49.)

3. Real estate descends under the laws of descent and distribution of the State where it is located, and personal estate according to the laws of the intestate's domicile at the time of his death. Bras-

well died domiciled in Kentucky, and all his real estate was in Kentucky, and his whole estate must, therefore, be distributed under the Kentucky laws. (24 Amer. & Eng. Enc. of Law, 425; Towns v. Durbin, 3 Met., 352; Sneed v. Ewing, 5. J. J. M., 460.)

CHARLES K. WHEELER FOR APPELLEES.

1. When an effort is made to bastardize children, every presumption of law and of public policy is in favor of their legitimacy and the courts will *presume* nothing tending to throw a doubt upon it. On the contrary they require the same degree of evidence to bastardize a child as to convict the parent of bigamy.

2. The law of the place where real property is situated determines the mode of its descent. (Sneed v. Ewing, 5 J. J. M., 460; 24th vol. Amer. & Eng. Enc. of Law, p. 426; McNutt v. Logan, Littell's Selected Cases, 60; Thomas v. Tanner, 6 Monroe, 58.)

3. If the Memphis marriage be admitted, and it be admitted that Braswell and his wife both knew his former wife was living before their children were begotten, still the appellees under the statute law of Kentucky, as construed by the courts, can and do inherit from their grandfather. (Sneed v. Ewing, 5 J. J. M., 460; Harris v. Harris, 8 Ky. L. R., 727; Littell & Swigert's Digest of the Laws of Ky., vol. 1, title, "Descent and Distribution," Gen. Stats., chap. 52, art. 1, sec. 4.)

CHIEF JUSTICE PRYOR DELIVERED THE OPINION OF THE COURT.

N. T. Braswell lived in the county of Lyon for many years. He died intestate, leaving no children surviving him, but several grandchildren, as well as a large estate. He had but two children, and both of them died before he did. One of his children, Ida, married Leonard, and her children, five in number, are the appellants in this case.

His son, Charles Braswell, at his death left children, and this controversy is between the children of Mrs. Leonard and the children of her brother Charles over the estate left by their grandfather, N. T. Braswell.

The appellants, who are the children of Mrs. Leonard, claim that the children of Charles Braswell (the brother of

their mother) are the offspring of a void marriage, and, therefore, not entitled to inherit from him or take by descent any part of their grandfather's estate.

The court below adjudged that the children of Ida and Charles Braswell stood in the shoes of their respective parents, and were entitled to inherit what their parents would have taken if living.

The origin of this litigation is based on the following state of facts: Charles Braswell (the father of the appellees) prior to the year 1863 incurred the displeasure of his father, or, for some other reason, left his home, which was in Lyon county, Ky., and took up his residence in Memphis, Tenn., under the assumed name of Charles Dobbins. About the year 1863, and when in Memphis, he married one Susan Beloate, and at the time of the marriage was going under the assumed name of Dobbins. In a short time he deserted his wife, and, after wandering from place to place. in the year 1866, he returned to Lyon county, to his father's home, and there succeeded in winning the affections of a young lady by the name of Josephine Dooms, and, under a promise of marriage, the two left their homes in Lyon county, and going to Cairo, Ill., were married at that place in accordance with the law of the latter State. They immediately returned to their homes in Lyon county, and there lived for many years, having had the two children who are the appellees in this case, and who, after their father's death, lived with their grandfather (the intestate) for some time, the latter dying, as the testimony conduces to show, without ever having known of his son's escapade in Memphis or that he ever had but the one wife, the mother of the children who are the appellees in the present case.

It was argued upon the hearing in this court that Charles ·

Braswell (alias Dobbins) never married Susan Beloate, but the testimony in the case upon this point is convincing, and we have no doubt but that a marriage with the Memphis woman took place in the year 1863, and while his sending his second wife back to Memphis shortly after their marriage, and his having been arrested at the instance of her uncle for bigamy and discharged, are facts tending to show that no lawful marriage had taken place, yet there were those who knew Charles Braswell well and attended the wedding, and, connected with other facts and circumstances not necessary to detail, concludes this question.

It seems to have been studiously concealed—this Memphis marriage—as the most intimate friends in Lyon county and the grandfather of these children were all kept in utter ignorance of the events that transpired at Memphis in 1863, or that the father of these appellees ever had but the one wife. They lived in Lyon county, raised these children, and for twenty-five years, and until this suit was instituted, the Memphis marriage was kept concealed, and we are satisfied the mother of the present appellees was not imbued with the belief that her husband had ever married the Memphis woman.

It is claimed by the appellants that the appellees are the offspring of a bigamous marriage, and have no right to inherit one-half or any part of their grandfather's estate, their father having died long before their grandfather.

The law of the State of Illinois, where the last marriage took place, is pleaded, to the effect that the issue of such a marriage were and are illegitimate and without inheritable blood, and the contention is that the *lex loci contractus* governs, not only as to the validity of the marriage but deter-

mines, once for all, the legitimacy or illegitimacy of the children.

It is conclusively shown that no statute was ever enacted in Illinois providing that the issue of marriages null or void in law shall nevertheless be legitimate, and it will be assumed that the issue of such marriages celebrated in that State are bastards as at the common law, and, the better to understand the argument of able counsel, it is further insisted the law of the State where the marriage takes place must make the offspring legitimate, and if the marriage was null and void by the law of Illinois the children must be held to be illegitimate wherever they go.

We shall not attempt to combat the proposition made by learned counsel that the *lex loci contractus* governs and determines the validity of the marriage, and, if valid when consummated, it must be held valid everywhere; and, if invalid, a like result follows. This doctrine can not be controverted, and the rule must be conceded to be that the law of the place of the marriage will generally govern as to the legitimacy or illegitimacy of the offspring.

There is then no difference between the court and counsel as to this well-settled doctrine, but the appellees maintain they are made legitimate by the Kentucky statute, which reads: "The issue of an illegal or void marriage shall nevertheless be legitimate, except the issue of an incestuous marriage, the marriage between a white person and a negro or mulatto, shall not be legitimate."

That every State has the power and the right to pass its own laws of descent counsel admit. but insists that this applies only where the marriages take place within the borders of the State passing such laws; and, if within its borders,

can determine the status of the children or their right to inherit.

It seems to us the confusion in this case arises from the failure to distinguish between the validity of a marriage and the right of the offspring of that marriage to inherit from their parents or collateral kindred.   The law of the State where the realty is located determines the mode of alienation or descent, and, as to personality, it passes under the law of the domicil of the owner.   The State of Kentucky in the exercise of its sovereign power has not attempted by the statute making certain children legitimate to validate marriages that were void where celebrated.

There can be no doubt of the power of the State to enact laws by which bastards may inherit from either father or mother or from both, and this in nowise affects the validity of the marriage contract when entered into either in the State or out of it.

Counsel have cited the case of Smith v. Kelly's heirs, 22 Miss., 167, and the case of McDeed v. McDeed, 67 Ill., 545, tending to establish the principle contended for and in fact the case of Smith v. Kelly's heirs is exactly in accord with his views, but when we look to the history of the statute under which these appellees claim to be legitimate, with the right to inherit from their grandfather and the decisions of this court upon the question, there is left little room for controversy.

The statute on which this claim rests is based on the Virginia statute of 1785, and was embodied in the statute of this State in the year 1796, and made a part of the statute regulating the mode of descent and distribution.   It then became a part of the Revised Statutes, and subsequently of the General Statutes, under the title of  Husband  and  Wife, and

there can be no doubt of its being a statute of descent and distribution, or creating such a status as to children within its provisions by which they may inherit not only from their parents but from collateral kindred.

The law of descent and distribution differs materially in many of the States of the Union, but this does not militate against the doctrine that a marriage, valid where celebrated, is valid anywhere, or, if void, must be so held; but such is not the question involved here. On the contrary, the only question is: Has Kentucky the right to regulate the law of descent or inheritance as to the property of its own citizens where the property is within its own territory?

In the case of Sneed v. Moore, 5 J. J. Mar., 159, it appears that Robert R. Moore lived in the State of Indiana at his death. Dying in that State he left a will that was admitted to probate. He devised a slave and a tract of land in Kentucky to Sneed. When the will was executed Moore was childless, but shortly before his death his wife gave birth to a child, a daughter, and in 1823 this daughter married a man by the name of Ewing. Ewing and his wife claimed the land and slave as the heir at law of her father. Sneed's defense was that she was not legitimate. Mrs. Moore, it seems, when she married Moore had a living husband. Moore's marriage to his wife took place in Kentucky. This court held that under the Kentucky statute, providing "the issue in marriage, deemed null in law, shall, nevertheless, be legitimate," Mrs. Ewing was entitled to the land, its descent being controlled by the law of this State; but as the slave was movable the law of Indiana must control as to his value. that being the domicil of Moore at his death.

The court in that case said, in discussing the effect of the statute: "It is a law of inheritance. It does not operate

extra territorially so as to legitimate in another State a child
who, by the law of that State, would be illegitimate there.
This statute would have applied to the land even if the mar-
riage had taken place in Indiana," and further "the law of
Kentucky, which declared that issue in marriage, deemed
null in law, should be legitimate can be applied only so far
as the estate in Kentucky, which descends according to her
law, may be concerned."

In the case of Jackson v. Moore and wife, 8 Dana, 170, a
provision of this same statute (1796), by which antenuptial
children were made legitimate by the subsequent marriage
of the parents, this court held the statute to be one of in-
heritance, and a child made legitimate by its provisions was
adjudged to inherit from the brother of her father, his
brother dying without children.

The word legitimate, as defined by Webster, means "born
in lawful wedlock; to put in position or state of a legitimate
person before the law by legal means; as to legitimate a
bastard child."

In Harris v. Harris, 85 Ky., 49, a Miss Deacon married one
Smith Ash in the State of Ohio (Cincinnati), in August, 1860.
In a short time after the marriage she brought an action for
a divorce that for some reason was dismissed. While she
was the wife of Ash she intermarried with one Harris, the
marriage to Harris taking place in Ohio also, but after this
last marriage she obtained a divorce from her first husband.
We have then both marriages taking place in the State of
Ohio, and the testimony showing proceedings for a divorce
from the first husband and the birth of several children the
offspring of the second marriage.

It was insisted in that case, the marriage being void, the
children could not inherit from the father. This court held

the last marriage void from its inception, but the children were legitimate and entitled to the father's estate by reason of the statute of 1796, that had been embodied in both the Revised and General Statutes, and said: "Where a marriage actually takes place—that is, where it is solemnized according to the forms of law—though void as between the parties the offspring are made legitimate by the statute."

It is, however, contended that section 4 of the Kentucky statute relative to void marriages, was intended to qualify something in the third section, and not to supply what they supposed had been omitted in the third section.

The third section makes in general terms the issue of an illegal or void marriage legitimate, and section 4 provides: "Where the marriage is contracted in good faith and with the belief of the parties that a former husband or wife then living was dead, the issue of the marriage, born or begotten before notice of the mistake, shall be the legitimate issue of both parties."

It is difficult to construe the fourth section as qualifying the third, unless it be said that in all void marriages, after notice of the mistake or the invalidity of the marriage, children begotten after this notice are illegitimate. Such could not have been the legislative meaning, and it is apparent the framers of the statute were fearful that something had been omitted in the third clause that required to be supplied by the fourth, and it is certainly more in accordance with the legislative intent to place this construction on the statute than to make the notice of the mistake on the part of the parents determine the legitimacy or illegitimacy of the children, as said in the case of Sams' administrator v. Sams, 85 Ky., 396, the statute should be construed according to its spirit and reason, and viewed in this light forbids

the conclusion reached by counsel. The fear of an indictment for bigamy would deter the parties from violating the law, and no harm can result from a construction not only consistent with the object of the Statute but in furtherance of a sound public policy.

Judgment affirmed.