# Richmond

MARGARET WITHROW, ETC., ET AL. V. WILMA FARMER
EDWARDS, ADM'X, ETC.

April 26, 1943.

Record No. 2613.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and
Spratley, JJ.

The opinion states the case.

*Rixey & Rixey* and *F. Gordon Hudgins*, for the plaintiffs in error.

*Phillips & Marshall*, for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

William Alexander Edwards, domiciled in South Carolina, married Marie Carter in 1933. While this wife was living and without obtaining a divorce from her, he married one Wilma Farmer in 1937. These last-named parties lived together as man and wife, and to them a child, Betty Jean Edwards, was born in South Carolina. Edwards acknowledged the child as his own and supported her from birth until August, 1941, when he, the woman and child moved from South Carolina to Newport News, Virginia, with the intention of making their permanent home in this State. There Edwards, as the head of the family, lived with and supported this woman as his wife and their daughter until October, 1941, when the woman was convicted on a misdemeanor charge. While the mother was in jail, he continued to contribute to his daughter's support.

On December 14, 1941, Edwards, a passenger, *en route* to see this woman, Wilma Farmer, at the city farm in Warwick county, was killed in a wreck of a taxicab owned by Margaret Withrow, trading as Royal Blue Cab Company, and driven by George A. Butts. Wilma Farmer qualified as administratrix on Edwards' estate and instituted this action for death by wrongful act against the owner and the driver of the taxicab. The jury returned a verdict for $10,000 and awarded the entire sum to Betty Jean Edwards, the only child of decedent. The trial court entered judgment on the verdict. From that judgment the defendants below obtained this writ of error.

It is conceded that, under the laws of South Carolina, Betty Jean Edwards is illegitimate and, in that State, she is

not entitled to participate in the distribution of her father's estate.

The controlling Virginia statute is Code, sec. 5270, which provides that "the issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate."

The dominant question presented is whether the law of the State of birth, which fixes the status of the child as illegitimate, or the law of the domicile of the decedent at the time of his death, shall be applied.

Defendants contend that the status of illegitimacy is of a permanent nature and, when once fixed, follows the individual into any State into which he may go. Story on Conflict of Laws, 8th ed., sec. 93 states: "Foreign jurists * * * generally * * * maintain that the question of legitimacy or illegitimacy is to be decided exclusively by the law of the domicile of origin." The principle is stated in the Restatement of the Law (Conflict of Laws, sec. 138) as follows: "The legitimate kinship of a child to either parent from the time of the child's birth is determined by the law of the State of domicile of that parent at that time." Other authorities cited by defendants to the same effect are: *Smith* v. *Kelly*, 23 Miss. 167, 55 Am. Dec. 87; *Irving* v. *Ford*, 183 Mass. 448, 67 N. E. 366, 97 Am. St. Rep. 447, 65 L. R. A. 177; Minor on Conflict of Laws, sec. 97; Beale on Conflict of Laws, sec. 138,1.

It may be conceded that, as a general rule, the foregoing principle is applied in many jurisdictions. However, the right of a child born out of wedlock, to inherit or share in the distribution of an estate, is determined by the application of two well-settled principles.

One of these is that the law of the domicile of he decedent is the exclusive law to be applied in determining the parties who are entitled to participate in the distribution of his personal property. "No principle can be better established than that the administration of the personal estate of a deceased person belongs exclusively to the country in which he is domiciled at his death. The courts of that country must decide who is entitled, and from their decision

there can be no appeal." *Doglioni* v. *Crispin* (1866), L. R. I. H. L. 301, 314. See Minor on Conflict of Laws, pp. 329, 330.

The other principle is that the law of the situs of the real estate must be applied in determining succession. Every State is clothed with sovereign power to adopt laws controlling the succession to property within its boundaries. When such laws have been adopted, they must be enforced though they be in conflict with the law of the domicile of the claimant. Inheritance is not a natural or absolute right. It is purely a creature of statute and is governed by the law of the situs.

Mr. Justice Lurton, in *Jones* v. *Jones*, 234 U. S. 615, 618, 34 S. Ct. 937, 58 L. Ed. 1500, said: "If one claim the right to succeed to the real property of another as heir and his right is denied because he must trace his pedigree or title to or through an alien, a bastard or a slave, the question is one to be determined by the local law."

With these principles in mind, we consider the controlling Virginia statute (Code, sec. 5270). Prior to the adoption of the Virginia statute of descents and distribution, the succession to property was controlled by the common law canons of descent, founded on the feudal system, and the statute of distributions, taken from the civil law, which operated on the theory of the presumed will of the intestate. In 1776 the General Assembly of Virginia appointed a committee of revisors to prepare changes in the existing legal system. Thomas Jefferson, a member of this committee, drafted the law of descent. This report was submitted to the General Assembly in 1779* but was not adopted until 1785 (12 Hening's Statutes at Large, ch. 60, p. 139). Section 17 of this statute, as originally adopted, read: "Where a man having by a woman one or more children, shall afterwards inter-

---

*The members of the Committee appointed on November 5, 1776, were Thomas Jefferson, Edmund Pendleton, George Wythe, George Mason and Thomas Ludwell Lee. Thomas Jefferson and George Wythe enclosed the report to the General Assembly in a letter bearing date June 18, 1779. 9 Hening's Statutes at Large, p. 175.

marry with such woman, such child or children, if recognized by him, shall be thereby legitimated. The issue also in marriages deemed null shall nevertheless be legitimate." This section was an integral part of the statute of descent.

Chapter 61, section 25, of the same act, after making certain provisions for the widow and the creditors, provided that the personal property of an intestate should be distributed to the same persons to whom lands were directed to descend in chapter 60.

The original act was copied without change in the Code of 1803 (ch. 93, sec. 19) and the Code of 1819 (ch. 96, sec. 19). The Code revisors of 1849 (ch. 123, secs. 6, 7) enlarged the meaning of the statute dealing with illegitimate children and, for the first time, divided the two sentences into separate sections with a slight change of verbiage. There has been no change in the statute since 1849. See Code of 1887, ch. 113, secs. 2553, 2554; Code of 1919, ch. 213, secs. 5269, 5270.

Judge Carr, in *Davis* v. *Rowe*, 6 Rand. (27 Va.) 355, 364, said: " * * * the framers of our Law, looked at the Common Law Canons of Descent to avoid, not to imitate? To pull down, not to build up? All its principles are violated; its landmarks removed; its fences broken down; its traces obliterated. While these marks of reprobation would seem (even if our Act were confessedly defective), to forbid our resorting to this exploded system to supply the defect, such resort is entirely unnecessary; for, I insist that our Act is a complete and perfect whole, containing within itself a provision for every case that can arise."

The last paragraph of the act, now Code, sec. 5270, appears to have been construed first by this court in 1804 in *Stones* v. *Keeling*, 5 Call (9 Va.) 143. The controversy arose between the legitimate children of William Keeling and his children by Athalia Arbuckle, to whom he was married, although Athalia Arbuckle had a husband living at the time from whom she had not obtained a divorce. Judge Tucker, who delivered one of the opinions of the court, said: "The act of 1785, it should be remembered, re-

lates to the disposition of property only; and proceeds to shew who shall be admitted to share the property of a person dying intestate, notwithstanding any former legal bar to a succession thereto. And, in that light, the law ought to receive the most liberal construction; it being evidently the design of the legislature, to establish the most liberal and extensive rules of succession to estates, in favour of all, in whose favour the intestate himself, had he made a will, might have been supposed to be influenced."

Judge Roane, in delivering a concurring opinion, said: "In the case before us, of a second and void marriage, the second husband stands merely on the foot of a stranger; but, with respect to his children begotten by the wife of another, supposed to be his wife, our act steps in and changes the former law; it erects into legitimate children those who otherwise would have been bastards."

In *Garland* v. *Harrison*, 8 Leigh (35 Va.) 368, 385, we said: "Our statute of descents is supposed to have been founded on the natural affections * * * . It takes men as it finds them; and in default of their providing by last will and testament for a division of their estates, it makes such a division amongst those who are near and dear to the intestate, as he would probably make, if he were to make a will according to the dictates of nature."

The facts in *Heckert* v. *Hile's Adm'r*, 90 Va. 390, 18 S. E. 841, were that the first wife of Peter Hile left him and moved to Michigan. He married again before the first marriage was dissolved. It was held that the statute legitimated the issue of the second marriage.

■ The statute (Code, sec. 5270), as construed by the cases cited, is a statute of inheritance and entitles the issue of a marriage "deemed null in law" to inherit from either parent or collateral kin.

■ This brief history of the statute reveals that Virginia was one of the first States in the Union to adopt broad and comprehensive legislation authorizing a bastard to inherit from his mother and to transmit property by succession to his mother and collateral kindred on his maternal

side. It removed the stigma of bastardy from the innocent issue of void marriages, as well as the issue born out of wedlock whose parents afterwards intermarried, provided such issue was recognized by the father as his child before or after marriage.

Statutes on the subject in the different States vary. The difference in language is the basic reason for the diversity of opinion on the subject. However, at least three States in the Union—Kentucky, Ohio and Arkansas—have enacted statutes similar to the Virginia statute (Code, secs. 5269, 5270).

The Virginia statute (Code, secs. 5269, 5270) was embodied in the statute law of Kentucky in 1796. *Leonard* v. *Braswell*, 99 Ky. 528, 36 S. W. 684, 36 L. R. A. 707, was decided in 1896. The facts were that Charles Braswell, a citizen of Kentucky, moved to Memphis, Tennessee, and there married. Several years later he returned to Kentucky and, without obtaining a divorce from his first wife, married a Kentucky girl. The ceremony was performed in Cairo, Illinois. The parties lived in Kentucky, where several children were born of this second marriage. Charles Braswell died. Several years later his father, N. T. Braswell, died intestate, leaving a large estate and several grandchildren. In the settlement of the estate, a controversy arose between the legitimate children of one child and the children of the bigamous marriage of Charles Braswell. It was conceded that the law of the State of Illinois, where the marriage took place, rendered the children of such bigamous marriage illegitimate. It was contended there, as here, that the law of the State where the marriage took place fixed the status of the offspring as legitimate or illegitimate and, if the marriage was null and void by the law of Illinois, the children must be held to be illegitimate wherever they go. The Kentucky court said: "We shall not attempt to combat the proposition made by learned counsel that the *lex loci contractus* governs and determines the validity of the marriage, and, if valid when consummated, it must be held valid everywhere, and, if invalid, a like result follows. This

doctrine cannot be controverted, and the rule must be considered to be that the law of the place of the marriage will generally govern as to the legitimacy or illegitimacy of the offspring. There is then, no difference between the court and counsel as to this well-settled doctrine; but the appellees maintain they are made legitimate by the Kentucky statute, which reads: 'The issue of an illegal or void marriage shall nevertheless be legitimate * * * .' That every state has the power and the right to pass its own laws of descent counsel admit, but insist that this applies only where the marriages take place within the borders of the state passing such laws, and, if within its borders, can determine the status of the children or their right to inherit. It seems to us that the confusion in this case arises from the failure to distinguish between the validity of a marriage and the right of the offspring of that marriage to inherit from their parents or collateral kindred. The law of the state where the realty is located determines the mode of alienation or descent, and, as to personalty, it passes under the law of the domicile of the owner. The state of Kentucky, in the exercise of its sovereign power, has not attempted, by the statute making certain children legitimate, to validate marriages that were void when celebrated.

"There can be no doubt of the power of the state to enact laws by which bastards may inherit from either father or mother, or from both; and this in no wise affects the validity of the marriage contract when entered into either in the state or out of it."

Counsel in the Kentucky case, as well as counsel for defendants in this case, relied upon the case of *Smith* v. *Kelly*, *supra*. Commenting upon that case, the Kentucky court said: " * * * in fact the case of *Smith* v. *Kelly* is exactly in accord with his views; but when we look to the history of the statute under which these appellees claim to be legitimate, with the right to inherit from their grandfather, and the decisions of this court upon the question, there is left but little room for controversy." The court then states that the statute was taken from the 1785 statute

of Virginia and, quoting from *Ewing* v. *Sneed*, 5 J. J. Marsh. 459, 460, said further: " 'The law of Kentucky which declared that issue in marriage deemed null in law should be legitimate can be applied only so far as the estate in Kentucky which descends according to her law, may be concerned.' "

Ohio adopted a statute identical with the Virginia statute (Code, secs. 5269, 5270) in 1805. The Ohio court, in *Ives* v. *McNicoll*, 59 Ohio St. 402, 414, 53 N. E. 60, construing this statute, said: "The statute of Virginia did not follow nor adopt any of the European laws as to bastards, but enacted a new statute on the subject to be construed and enforced by reference to the words used in the statute itself, untrammeled by the rules of the civil law. * * * *Stones* v. *Keeling*, 5 Call 143; *Browne* v. *Turberville*, 2 Call 390; *Templeman* v. *Steptoe*, 1 Munf. 339; *Davis* v. *Rowe*, 6 Rand. 355; *Garland* v. *Harrison*, 8 Leigh 368."

The same statute (Code, secs. 5269, 5270) was enacted by the State of Arkansas without substantial change. The facts in *Evatt* v. *Mier*, 114 Ark. 84, 169 S. W. 817, L. R. A. 1916C, 759, were that Frank Mier died intestate in Arkansas. While domiciled in Texas, he married Annie Miller, by whom he had one child, Frank Mier. About a year later, he married his first wife's sister, Lidmilla Miller, without obtaining a divorce from the first wife, Annie. Mier and his second wife first lived in Texas, then in Indian Territory, and later moved to Arkansas, where he accumulated property, and continued to live with Lidmilla Miller until a short time before his death. To the second union, several children were born. It does not appear from the opinion whether the children were born in Arkansas, Indian Territory or Texas. The opinion states that the Arkansas statute was copied from the Virginia statute of 1785, and that the construction of the statute by this court in *Stones* v. *Keeling, supra*, and *Heckert* v. *Hile's Adm'r, supra*, followed by the Kentucky court in *Leonard* v. *Braswell, supra*, and the Ohio court in *Ives* v. *McNicoll, supra*, was controlling.

█ Edwards, at the time of his death, was domiciled in Virginia. His personal property must be administered and distributed under the provisions of the Virginia statute, by which statute Betty Jean Edwards is declared to be a distributee regardless of her personal status in other jurisdictions.

█ █ However, the action under review was instituted pursuant to the provisions of Code, secs. 5786-88. The statute does not have any extraterritorial effect. It creates the right of action, limits the amount recoverable and names the classes of beneficiaries who may be entitled to share in the amount recovered. Any distribution of the fund recovered for a tortious killing committed in this State must be in accordance with this statute creating the right of action. *Nelson v. C. & O. Ry. Co.*, 88 Va. 971, 14 S. E. 838, 15 L. R. A. 583; *Ross v. Eaton*, 90 N. H. 271, 6 A. (2d) 762; *Wise v. Hollowell*, 205 N. C. 286, 171 S. E. 82; *Hartman v. Duke*, 160 Tenn. (7 Smith) 134, 22 S. W. (2d) 221.

The pertinent part of Code, sec. 5788, provides that "the amount recovered in any such action shall be paid to the personal representative, and * * * shall be distributed by such personal representative to the surviving wife, husband, child and grandchild of the decedent * * * and shall be free from all debts and liabilities of the deceased."

█ It is clear that the primary object of the statute, like its prototype, Lord Campbell's act, is to compensate the family of the deceased and not to benefit his creditors (*Richmond v. Martin*, 102 Va. 201, 45 S. E. 894). Betty Jean Edwards is the only surviving child of the decedent. She has been a member of decedent's family since birth. In the death of her father, she suffered a substantial loss. He had bestowed upon her a father's love, care and affection, and he had maintained and supported her. The recovery obtained is in compensation for these losses.

█ In *Powell's Adm'x v. Powell*, 84 Va. 415, 4 S. E. 744, it was held that money received by the administrator in a compromise settlement of an action for wrongful death, after paying costs and attorney fees, must be distributed

according to the statute of distribution. However, if the distributees named in the statute of descents and distribution are different from the persons entitled to the proceeds named in Code, sec. 5788, the provisions of the latter control.

The personal representative of a decedent killed on the high seas, under the Federal Death Act, 46 U. S. C. A., secs. 761, 764, may maintain an action for death by wrongful act "for the exclusive benefit of the decedent's wife, husband, parent, child or dependent relative * * * ."

The questions presented to the Circuit Court of Appeals, Second Circuit, in *Middleton* v. *Luckenbach S. S. Co.*, 70 F. (2d) 326, were whether an illegitimate child could recover under the act damages for the death of its mother; whether a mother was entitled to recover damages for the death of an illegitimate child; and whether an illegitimate child, whose parents had married after its birth, could recover damages for the death of his father. That court, discussing these questions, said: "There is no right of inheritance involved here. It is a statute that confers recovery upon dependents, not for the benefit of an estate, but for those who by our standards are legally or morally entitled to support. Humane considerations and the realization that children are such, no matter what their origin, alone might compel us to the construction that, under present day conditions, our social attitude warrants a construction different from that of the early English view. The purpose and object of the statute is to continue the support of dependents after a casualty. To hold that these children or the parents do not come within the terms of the act would be to defeat the purposes of the act. The benefit conferred beyond being for such beneficiaries is for society's welfare in making provision for the support of those who might otherwise become dependent."

While the Federal and the Virginia statutes do not designate persons entitled to receive benefits under them in identical language, the primary object of the two legislative acts is the same. See *Low Moor Iron Co.* v. *La Bianca's Adm'r*, 106 Va. 83, 55 S. E. 532.

Whether Betty Jean Edwards, under the law of descents and distribution, is held to be a distributee of her father's estate, or whether she is regarded as the natural child and a dependent member of decedent's family in Virginia at the time of his death, she is entitled to the proceeds of the judgment in question.

We find no reversible error in the rulings of the trial court set forth in the other assignments of error.

The judgment is

*Affirmed.*