### Richmond

MARY LEE VICARS, ET AL.

V.

LOIS FRANCES MULLINS, ET AL.

Record No. 812003.

June 15, 1984.

Present: All the Justices.

*H. Eugene Cochran* for appellants.
*Stephen M. Quillen; George A. Pruner*, for appellees.

COCHRAN, J., delivered the opinion of the Court.

The question for determination in this appeal is whether the illegitimate son of a male devisee under a will is "issue" of the devisee within the meaning of the will.

James P. Keith died on February 15, 1904, leaving a will dated February 10, 1904, and probated in May of 1904. The will contained the following provisions:

> Fourth: I will my grandson W. S. Salyer also one third of all my Real Estate to be given him on the upper end of my farm and if he should die without Issue, I then want Jennie Vicars my Daughter to have it during her life, and then to go to her son Garfield if he is living, but if he die without issue then to go to her son Hobart Vicars.

In 1978, Mary Lee Vicars, Rufus H. Vicars, Vivian Vicars, Oshia Arbutus Stivers, Ancil M. Vicars, Shirley Vicars, Cecil E. Vicars, Judy Vicars, and Ossie Lee Nickles, filed a bill of complaint in the trial court seeking construction of the Fourth clause in the Keith will. They alleged that W. S. Salyer never married and that he died without issue in 1956, predeceased by Jennie Vicars, and by Garfield Vicars, who also died unmarried and without issue, leaving Hobart Vicars as the devisee under the Fourth clause of a tract of land containing approximately 55 acres described by metes and bounds. Complainants alleged that Hobart Vicars died intestate in 1971 leaving his widow, Mary Lee Vicars, and his children, Rufus H. Vicars, Oshia Arbutus Stivers, Ancil M. Vicars, Cecil E. Vicars, and Ossie Lee Nickles, the owners of the tract. They further alleged that Gilbert Willard Salyer, who "apparently" had been adopted by W. S. Salyer, and his wife purported to convey the land in 1977 to Lois Frances Mullins, who, with James A. Mullins, her husband, purported to convey a part of the land in 1978 to Raymond Howard Mullins and Emma Lou Mullins.

The bill of complaint named as defendants Lois Frances Mullins, James A. Mullins, Raymond Howard Mullins, and Emma Lou Mullins. Complainants sought an order to restrain defendants from going upon the land, an award of rents and profits for the period defendants unlawfully detained the tract, and an adjudication that complainants were the owners of the tract under the Keith will or by adverse possession. Defendants filed an answer alleging that Gilbert Willard Salyer was the natural as well as the adopted son of W. S. Salyer, that he was W. S. Salyer's issue, that he acquired the land as W. S. Salyer's sole heir at law, and that defendants as purchasers were Gilbert's successors in title.[1]

The trial court referred the case to a commissioner in chancery to report on the matters in controversy. In his report, the commissioner summarized the evidence taken before him. He stated that W. S. Salyer, also known as Scott W. Salyer and Willard Scott Salyer, adopted Gilbert Willard Johnson on May 18, 1918, and that defendants offered evidence to show that W. S. Salyer was the natural and biological father of Gilbert, who was born in 1901. The commissioner reported that W. S. Salyer did not marry Maggie Johnson, Gilbert's mother, and that defendants offered evidence that her father threatened to prosecute W. S. Salyer because of her pregnancy and that James P. Keith paid $500 to her parents "to stop the prosecution."

The commissioner found that W. S. Salyer had not complied with the applicable statute as required to legitimatize an illegitimate child and that the adoption did not make Gilbert legitimate. Accordingly, the commissioner was of opinion that Gilbert was not W. S. Salyer's "issue" within the meaning of the Fourth clause of the Keith will. He concluded that Hobart Vicars became vested with fee simple title to the land upon W. S. Salyer's death in 1956. The commissioner reported that Hobart died intestate in 1971, that his widow, Mary Lee Vicars, thereafter conveyed her dower interest to Ossie Lee Nickles, and that the land was owned by Hobart's five children, complainants Rufus H. Vicars, Oshia Stivers, Ancil Vicars, Cecil Vicars, and Ossie Lee Nickles, with

---

[1] Defendants also filed a motion to dismiss Mary Lee Vicars as a complainant on the ground that she had conveyed her interest in the property to Ossie Lee Nickles. By order entered July 11, 1979, the trial court dismissed Mary Lee Vicars as a party but directed that the cause continue under the same style as before.

Nickles also owning her mother's dower interest.[2] The commissioner further reported that the land described in the bill of complaint incorrectly included a parcel of 1-½ acres acquired by W. S. Salyer by purchase.

Defendants filed exceptions to all portions of the commissioner's report except the finding as to the 1-½ acre parcel. The trial judge filed a written opinion dated July 29, 1981, in which he stated that defendants' exceptions should be sustained, "that the defeasible fee of W. S. Salyer vested in him as Fee simple upon his death with issue, and then passed to his adopted son Gilbert Willard Salyer by the Virginia laws of descent and distribution." In the opinion, the judge made findings of fact which amplified those in the commissioner's report. For example, the judge found unequivocally that Gilbert Willard Salyer was the natural and biological son of W. S. Salyer. He also found that W. S. Salyer offered marriage to Gilbert's mother, Maggie Johnson, but that the offer was rejected by her father who instead threatened prosecution, and that Keith (who the record shows was at that time the legal guardian of W. S. Salyer, a minor) borrowed $500 and paid it to Maggie's father as a "paternity fee."

The opinion itemized the evidence upon which the judge relied, including the written consent of Gilbert Willard Johnson and his mother, Maggie Johnson Castle, which was filed with W. S. Salyer's petition for the adoption of Gilbert and the change of his name to Salyer.[3] The judge reached the conclusion of law that Gilbert was issue of W. S. Salyer within the meaning of Keith's will. A final decree entered by the trial court on September 3, 1981, confirmed that title to the land passed to Gilbert as sole heir at law of W. S. Salyer and thereafter to defendants as Gilbert's successors in title. The decree approved, without objection, the commissioner's finding that the 1-½ acre parcel was not a part of the land devised under the will.

As the trial court concluded, under the Fourth clause of Keith's will the testator devised to W. S. Salyer a fee simple estate defeasible if Salyer were to die without issue. *See Daniel* v. *Lipscomb*, 110 Va. 563, 66 S.E. 850 (1910); 1 Minor on Real Property §

---

[2] The other complainants, Vivian Vicars, Shirley Vicars, and Judy Vicars, were never identified in the pleadings or in the commissioner's report.

[3] The record shows that W. S. Salyer was born October 3, 1883, and that he had been serving in the United States Army for 17 years when he adopted Gilbert in 1918. It is undisputed that he died intestate in 1956 and that Gilbert died in 1977.

180, n.9 (2d ed. Ribble 1928). On appeal, appellants (complainants in the trial court) contend, as they did below, that the word "issue" in the will meant lawful issue and did not include an illegitimate child. Therefore, they say, since W. S. Salyer died leaving no surviving legitimate issue, his death terminated the defeasible fee and fee simple title to the land was thereupon vested in Hobart Vicars.

Appellees correctly point out that, contrary to appellants' contention, the trial court did not hold that Gilbert Willard Salyer took under Keith's will. Nevertheless, in determining that Gilbert acquired fee simple title to the land as the adopted son and sole heir at law of W. S. Salyer, the trial court found that Gilbert was the biological son of W. S. Salyer and ruled that as such he was W. S. Salyer's surviving issue within the meaning of the Fourth clause of Keith's will. It is this ruling that we are called upon to review. In doing so, we will accept as binding upon us the finding of fact made by the trial court, based upon credible evidence, that W. S. Salyer was Gilbert's father.

■ We have defined "issue" as "natural descendants of a common ancestor." *Munday* v. *Munday's Ex'rs.*, 164 Va. 145, 150, 178 S.E. 917, 919 (1935), *quoted with approval in Fletcher* v. *Flanary*, 185 Va. 409, 415, 38 S.E.2d 433, 435 (1946). "Issue" does not include adopted children unless the intent to include them is "expressly or reasonably implied by the language of the will or may be reasonably inferred from extrinsic evidence properly before the court." *Langhorne* v. *Langhorne*, 212 Va. 577, 578, 186 S.E.2d 50, 51, *cert. denied*, 406 U.S. 946 (1972). *See Merson* v. *Wood*, 202 Va. 485, 117 S.E.2d 661 (1961); *Newsome* v. *Scott*, 200 Va. 833, 108 S.E.2d 369 (1959); *Fletcher* v. *Flanary*, 185 Va. 409, 38 S.E.2d 433 (1946). Therefore, Gilbert's status as the adopted son of W. S. Salyer did not bring him within the meaning of "issue."

■ There are no Virginia cases dealing directly with the question whether an illegitimate child takes under a will as issue of the father. This Court has determined, however, that an illegitimate child was entitled to take under a will leaving property to the mother's "children."

In *Bennett* v. *Toler*, 56 Va. (15 Gratt.) 588 (1860), Joseph Toler in his will left his daughter, Mary Bennett, certain property on condition that at her death it would be divided equally among her children. About 16 or 18 years before Toler's death, Bennett

had an illegitimate son, whose existence was known to Toler. We referred in the opinion to what was said " 'to be an established rule, that a gift to children, sons, daughters or issue, imports *prima facie* legitimate children or issue, excluding those who are illegitimate. . . .' " *Id.* at 620, *quoting from* 2 Jarman on Wills 94 (J. C. Perkins 2d ed.). We also recognized, as an exception to the general rule, that illegitimate children may take under a will if the testator clearly identifies them. *Id.* at 621, 623. We said that the general rule remained valid as to the father. *Id.* at 624. We held, however, that since illegitimate children were allowed to inherit from the mother (Code 1860, c. 123, § 5), they were placed on the same footing with legitimate children as to the mother, and Bennett's illegitimate child, as well as her legitimate children, came within the meaning of "children" under the will. *Id.* at 627-28, 631.[4]

The word "issue," according to Black's Law Dictionary, "is commonly held to include only legitimate issue." Black's Law Dictionary (5th ed. 1979). Courts in several states have adhered to this meaning. Pennsylvania courts, for example, have held that "issue" connotes legitimate issue only. *In re Taylor's Estate*, 357 Pa. 120, 53 A.2d 136 (1947); *In re Thorn's Estate*, 353 Pa. 603, 46 A.2d 258 (1946). *See also Cooper* v. *Melvin*, 223 Ga. 239, 154 S.E.2d 373 (1967); *Large* v. *National City Bank of Cleveland*, 14 Ohio App.2d 234, 170 N.E.2d 309 (1960).

It has also been held that the fact that a testatrix knew about certain illegitimate children does not prove that she intended the term "issue" to include them. In *In re Trust Estate of Bohnsack*, 20 Wis.2d 448, 122 N.W.2d 443 (1963), the testatrix directed that upon her daughter's death, the corpus and accumulated income in a trust should be paid to the daughter's surviving issue. Before the testatrix's death, her daughter gave birth to two illegitimate children, of whose existence testatrix was aware. The court held that the term "issue" is presumed to refer to legitimate children only, and that mere knowledge of an illegitimate child's birth does not rebut this presumption. *Id.* at 451, 122 N.W.2d at 445.

Where the language of a will, however, shows an intent that "issue" include illegitimate children, the intent will be upheld. *See*

---

[4] In contrast to our holding in *Bennett*, it appears that historically most jurisdictions have approved the general rule that in the construction of wills, as to both father and mother, the word "children" *prima facie* means legitimate children. *See* Annot., 34 A.L.R.2d 4, § 5 (1954).

*Fiduciary Trust Co.* v. *Michou*, 73 R.I. 190, 54 A.2d 421 (1947). Thus, in *Northwestern National Bank of Minneapolis* v. *Simons*, 242 N.W.2d 78 (Minn. 1976), the settlors of a trust used the words "issue" and "legal issue" in different provisions of the trust. Stating that it was unlikely the settlors would have used both "issue" and "legal issue" had they wished to exclude illegitimates, the court held that "issue" included illegitimates. *Id.* at 79-80.

■ Finally, there are cases which have held unequivocally that "issue" includes illegitimate children. A Connecticut court has held that absent any indication to the contrary, the words "issue of his or her body" include illegitimate children. *Eaton* v. *Eaton*, 88 Conn. 286, 91 A. 196 (1914).

Recently, a New York court, overruling precedents that had followed the general rule for more than 100 years, held that the word "issue" included illegitimate as well as legitimate descendants "in the absence of an express qualification by the testatrix." *Will of Hoffman*, 53 A.D.2d 55, 65, 385 N.Y.S.2d 49, 56 (1976). The court observed that the presumed intent of the testator, under the precedents, to exclude illegitimate descendants, although theoretically rebuttable, was in fact irrebuttable in most cases because of the passage of time. *Id.* at 63, 385 N.Y.S.2d at 55. Relying for the most part on the increasingly compassionate societal attitudes toward illegitimate children, the court reversed the presumed intent that "issue" included only legitimate descendants. *Id.* at 65, 385 N.Y.S.2d at 56.

We have construed the word "children" as used in the Virginia wrongful death statute (now Code §§ 8.01-50, *et seq.*) to include an illegitimate child as beneficiary of a compromise settlement of an action arising from her father's death. *Carroll* v. *Sneed*, 211 Va. 640, 179 S.E.2d 620 (1971), *citing with approval Withrow* v. *Edwards*, 181 Va. 344, 25 S.E.2d 343 (1943). In *Carroll*, it was stipulated that the child was the decedent's illegitimate daughter. Rejecting the argument that construing the statute to include illegitimate children would promote fraudulent claims, we observed that the child has the burden of proving that the decedent was the parent, and that we should not assume that the courts will not properly determine issues of paternity in accordance with the evidence. *Id.* at 643, 179 S.E.2d at 622.

■ The statute relied upon in *Bennett*, which allowed an illegitimate child to inherit from his mother, has been expanded by 1978 amendment (Acts 1978, c. 647, codified as Code § 64.1-5.1)

to allow such a child to inherit from his father under certain circumstances, provided paternity is established in accordance with specified requirements. This statute was not available to W. S. Salyer, however, for he died before its enactment.

In 1904, when Keith died, an illegitimate child could not inherit from his father. Under the applicable statute, the father could make the child legitimate by marrying the mother and recognizing the child as his before or after marriage. Code 1887, § 2553. The same statute, recodified as Code 1950, § 64-6, was in effect at the time of W. S. Salyer's death.

Although W. S. Salyer could not confer legitimacy upon Gilbert after Maggie Johnson married another, he did the next best thing by adopting him in 1918. This act, commendable though it was, occurred 14 years after Keith's death. Keith's intent is the crucial factor in the construction of his will. *See Powell* v. *Holland*, 224 Va. 609, 299 S.E.2d 509 (1983). He was undoubtedly aware of Gilbert's existence at the time he executed his will. He used the word "issue" once in the Third clause and twice in the Fourth. In the Third clause, he devised one-third of his real estate to his daughter Virginia Vicars for life and at her death to her son Garfield Vicars if living, and if he should die without issue, then to her son Hobart Vicars. Thus, the testator followed the same format in both the Third and Fourth clauses. He did not say "lawful issue" or "legitimate issue." He did demonstrate a desire that the land remain in the family.

In view of the general rule recognized in *Bennett*, we hold that the presumed intent of Keith was to require that W. S. Salyer leave legitimate issue to prevent the land from passing to Hobart Vicars. Although he was not leaving the land to W. S. Salyer's issue, the existence or non-existence of issue, as Keith intended the word to mean, determined the status of the title. As to Keith, the evidence permits only the inference that he was aware of Gilbert's paternity. There is no evidence that Keith ever had any contact with Gilbert or that W. S. Salyer, who had been in the Army for 17 years by 1918, had any contact with the child before Keith's death. We hold, therefore, that the evidence is insufficient to rebut the presumed testamentary intent. Accordingly, we will reverse the decree of the trial court and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*