FIDUCIARY TRUST COMPANY, *Ex'r. et al. vs.* AIMEE HENRY MICHOU *et al.*

JULY 23, 1947.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. This bill in equity was brought by the Fiduciary Trust Company and Daniel E. Watson as executors respectively of the wills of the last surviving successor trustees under the will of the late Mary M. Bourne, of the city of Newport in this state, deceased. The bill prays for the construction of a certain portion of the Bourne will and for instructions as to whom the principal of a trust fund created thereunder shall be paid, the trust having terminated.

The respondents Aimee Henry Michou and Martha Sakrausky have a direct interest in the matter at issue. The interests of the many other respondents are contingent. It is admitted that, with the exception of Martha Sakrausky, personal service was had on all respondents, who either filed answers to the bill or allowed it to be taken *pro confesso*. Because of war conditions, service on Martha Sakrausky, who apparently has never resided in this country, was had by publication. Hereinafter, in most instances, Aimee

Henry Michou will be referred to as Aimee, and Martha Sakrausky as Martha.

It is not disputed that Martha is a resident of Fresach, Austria, and that she has been treated as a national of Germany, at that time an enemy country, by the duly constituted agents of the federal government. On October 25, 1945, the alien property custodian of the United States issued an order, No. 5295, vesting in himself, for the benefit of the United States, all right, title, interest and claim of any kind or character whatsoever of Martha in and to the trust under the will of Mary M. Bourne. By executive order No. 9788, effective October 15, 1946, the office of alien property custodian was terminated and all of its functions and powers, and those of the alien property custodian, were transferred to the attorney general of the United States. Thereafter the attorney general was duly substituted as a respondent in this cause in place of the alien property custodian, and he, the attorney general, in his official capacity and to the extent allowed by law, now claims the rights of Martha in the principal of the trust in dispute.

A hearing on the bill, answers, replications and proof was had in the superior court. The cause being ready for hearing for final decree, the superior court has, in accordance with general laws 1938, chapter 545, §7, certified it to this court for determination.

Mary M. Bourne died September 3, 1881, leaving a last will and testament, dated September 30, 1879, which was admitted to probate in Newport January 16, 1882. So far as pertinent for our purposes, the will provides for the creation of a trust fund of $25,000, the income of which is directed to be paid to the three children of a deceased daughter, Martha S. Parker, during their lives, and, upon their death, the principal is to be paid to their issue. The provision of the will now before us for construction reads as follows: "I give to the said Charles U. Cotting the sum of Twenty-five thousand dollars. In trust: to pay one third of the net income to each of the three children of my de-

ceased daughter Martha S. Parker, & upon the death of each of said children to transfer & pay over the share, of which such child received the income, *to such child's issue,* and if it leaves no issue to hold said share in trust for & to the use of the other children or the child of said Martha & the issue of such as have deceased in case of a child of said Martha's so taking, the net income only of the share to be paid during such childs life to such child & upon such childs death the principal to be dealt with in the same manner as the original share given for the benefit of such child, and in case of *the issue of a deceased child taking,* the principal to be paid over & transferred to them." (italics ours)

The will also provides: "By the words children and issue, used in this will, I mean those by blood and not those by adoption."

Martha S. Parker, the deceased daughter of the testatrix mentioned in the clause above quoted, left three children: James Parker, who died unmarried December 18, 1930; Charles T. Parker, who died August 12, 1912, without issue but left an adopted daughter, Grace P. Shearer, who was excluded from participation in the trust by the last above-quoted provision; and Mary Martha Parker, who married Archibald H. Taylor and died June 2, 1943, leaving two children, Aimee and Martha, both of whom were born out of wedlock. Hereinafter Mary Martha Parker will be referred to as Mrs. Taylor, or as the mother of Aimee and Martha. At the time of Mrs. Taylor's death, various descendants of the sisters of Martha S. Parker, the deceased daughter of the testatrix, were living and they have been made respondents in this cause.

Mention may be made at this time of the residuary clause of the will, because if there are no members of the class described by the words "such child's issue" in the clause before us for construction, or if any member of that class refuses or is unable to take, then the principal of the trust will fall into the residuary estate. Omitting unnecessary details, the will divides the residuary estate into three shares, each

share being left in trust for the beneficiaries named in each such trust. With the exception of Aimee and Martha, all respondents are claimants under the trusts of the residuary clause.

It appears in evidence that about June, 1928 Aimee Morecroft, now Aimee Michou, brought an action for a declaratory judgment against her mother, Mrs. Taylor, in the supreme court of New York. *Morecroft* v. *Taylor*, 225 App. Div. 562. The main purpose of that action was to establish that Aimee was the daughter of Mrs. Taylor, so that she, Aimee, might be in a position to claim certain remainder interests under the wills of her maternal great-grandfather and grandfather respectively. Before a determination of the matters involved in the New York case, the supreme court of Massachusetts decided the case of *Williams* v. *Taylor*, 276 Mass. 349, which apparently indirectly affected the above-mentioned interests of Aimee.

Shortly after the decision by the Massachusetts court, Mrs. Taylor entered into two agreements which have a vital bearing on the questions before us in the instant cause. The parties to the first agreement, dated December 14, 1931, were Mrs. Taylor, Aimee, and their respective attorneys. The second agreement, which was for the benefit of Mrs. Taylor's other daughter, Martha, is dated January 14, 1932, the parties thereto being Mrs. Taylor and certain attorneys of a firm of lawyers in New York. We shall hereinafter refer to the first of these agreements as the Michou agreement, and to the second as the Sakrausky agreement.

The Michou agreement recited that, whereas the parties were anxious to terminate the then pending litigation in the New York court and to avoid future litigation, Mrs. Taylor agreed to pay Aimee a certain sum per year during their joint lives, and another certain sum for the purchase by the latter of a "permanent home", which was not to be sold or otherwise disposed of during their joint lives. She also agreed to devise, bequeath, and appoint one third of all property over which she had power of disposition under the

wills of her grandfather, James Parker, and her father, Richard T. Parker, in trust to pay 40% to Aimee's attorney as counsel fees and the income from the remaining 60% to Aimee for her life.

The agreement then provided that the pending action be discontinued and the summons and complaint be withdrawn from the files of the court; that the attorneys for the daughter turn over to the mother's attorneys such summons and complaint, together with all documents and other evidence "tending to establish the alleged relationship between the parties to said action"; that all such documents and evidence were to be held by the mother's attorneys in escrow until the dispositions for the daughter's benefit were effectuated, in which event the documents and evidence were to be destroyed; otherwise they were to be returned to the daughter or her attorneys.

In article Third of the agreement, Aimee released generally all claims and demands that she might have had against her mother, excepting only her rights under the agreement, and further "surrenders, releases, relinquishes and renounces all rights and claims as heir, legatee, beneficiary or otherwise: (a) Under the will of Mary M. Bourne", which is the one now before us; under the wills of five other persons identified in subsections (b), (c), (d), (e), (f), and "(g) Under any other will or in or against any other estate, to the extent that any such right or claim might be predicated upon any relationship between the parties of the first and second parts", that is, Mrs. Taylor and Aimee as mother and daughter. Article Fourth excepts certain interests from the provisions of article Third.

Article Fifth of the agreement first provided, among other things, that Aimee would never, publicly or privately, assert or claim the relationship of daughter to the party of the first part, Mrs. Taylor, and then proceeded as follows: "The covenants herein contained shall survive the death of the party of the first part, and shall continue in full force and effect with respect to and for the benefit of her heirs, next

of kin, devisees, legatees, and personal representatives . . . .
In the event of the breach by the party of the second part
(Michou) of any of the covenants to be *by her performed*
under the provisions of this agreement . . . any heir, next
of kin, devisee, legatee or beneficiary of any of the persons
mentioned in Article Third hereof, shall, in addition to any
other rights or remedies enuring to her or them in the prem-
ises, have the right to apply to a court of equity for appro-
priate relief, whether by injunction or otherwise." (italics
ours)

It is undisputed that Mrs. Taylor fully performed her
obligations under this agreement. She made all payments
required and she further devised, bequeathed and appointed
her property in accordance with its terms. It also appeared
in evidence that during the period from 1926 to 1942 Aimee
had received from Mrs. Taylor, both voluntarily and under
the agreement, $34,350.02.

We now turn to the Sakrausky agreement. This agree-
ment between Mrs. Taylor and her attorneys contained no
express covenant of renunciation. It provided that one of
those attorneys, subsequently determined by the contin-
gency of survivorship to be Harland B. Tibbetts, would hold
certain property, devised, bequeathed and appointed to him
in Mrs. Taylor's will, for the benefit of "Martha Sakrausky
and/or her children, in the manner, to the extent and upon
the conditions hereinafter expressed." It further provided
that Martha would forfeit all rights thereunder if she, or
any one claiming through her, should assert any claim or
demand in any legal proceeding or otherwise "based upon
any alleged blood relationship between the said Martha Sa-
krausky and the party of the first part", namely, Mrs. Tay-
lor.

The evidence shows that Martha was never in this coun-
try, and that she never knew that Mrs. Taylor was her
mother, or that the latter had executed the agreement just
described. The evidence further shows that during the

period from 1926 to 1942 Martha received from Mrs. Taylor, both voluntarily and under the agreement, $21,621.21.

Early in 1937 it became necessary to appoint trustees of certain trusts in estates in which Mrs. Taylor had an interest. Among these estates was that of Mary M. Bourne, the testatrix of the will now before us, and that of Richard T. Parker, Mrs. Taylor's father, a portion of which latter estate was to go to Aimee under the agreement with her mother. As investigation revealed that there was "a shrinkage" of the trust fund under the Parker will, Mrs. Taylor was advised by her attorneys to execute two affidavits concerning her relationship to Aimee and to Martha, in one of which affidavits she acknowledged that she was the mother of the former, and in the other that she was the mother of the latter. Each affidavit specified the date and place of birth of the child therein named.

■ Excluding for the present all consideration of the agreements and the affidavits, the basic question in this case is whether Aimee and Martha, illegitimate children of Mrs. Taylor, are entitled to the principal of the trust estate under the will of Mary M. Bourne. We recall that the will provided for the payment of one third of the net income of the $25,000 trust fund to each of the three children of her deceased daughter, Martha S. Parker, and "upon the death of each of said children to transfer & pay over the share, of which such child received the income, to such child's issue". Furthermore, the testatrix clearly expressed the meaning that she attributed to the words "children" and "issue" when she stated in her will that "By the words children and issue, used in this will, I mean those by blood and not those by adoption." In the absence of statutory prohibition, it is plain from the language of the testatrix alone that an illegitimate child would be included in the terms "children" and "issue" as defined by her in the will. The class of children that she intended to benefit were the "children and issue . . . by blood" and not those by adoption. This clear language of the testatrix cannot be disregarded if, according

to the primary rule of construction of a will, her intention, which was lawful, is to govern.

Furthermore, in this state, by statute and judicial determination, "A child born out of wedlock shall be capable of inheriting or transmitting inheritance on the part of his mother in like manner as if born in lawful wedlock." G. L. 1938, chap. 567, §7. *Rhode Island Hospital Trust Co.* v. *Hodgkin,* 48 R. I. 459, rehearing denied, 138 A. 184; *Briggs* v. *Greene,* 10 R. I. 495. Under the law of this state, Aimee and Martha are capable of inheriting through their mother, Mrs. Taylor, who was the only life beneficiary of the Bourne trust at the time of her death. It is our judgment, therefore, that Aimee Henry Michou and Martha Sakrausky each takes one half of the principal of the trust fund under the will of Mary M. Bourne, unless either or both of them are precluded from receiving their respective portion of that principal by reason of the agreements hereinbefore described.

In proceedings for the construction of a will this court will not ordinarily concern itself with a collateral agreement with reference to the rights of interested parties under the will. But the circumstances in this case are so unusual and the Michou and Sakrausky agreements are so intimately and inextricably connected with the will under consideration that we feel warranted in making an exception to our usual rule and will consider those agreements, especially since a trust under that will has terminated and the trustees request instructions as to whom the principal thereof, in the sum of $25,000, shall be paid.

In construing a contract the primary object is to ascertain and give effect to the intention of the parties, if lawful and possible. A contract may consist of various provisions which may appear to be independent and separable propositions, but which, when closely analyzed, are in reality merely component parts of a single purpose. In the instant cause we have Aimee renouncing all her rights and interest in and to certain specified estates in return for which Mrs. Taylor agreed to set up a trust for her benefit. If these were the

only provisions in the agreement, one might well say that the mother and daughter engaged in a purely monetary transaction. However, a careful consideration of the entire agreement in the light of the circumstances that brought it into existence clearly shows that such was not its ultimate objective.

The real purpose of the agreement was the concealment of Aimee's relationship to Mrs. Taylor. The covenants above mentioned are incidental to and in the nature of buttresses to the nondisclosure covenant of the agreement, which, in our judgment, reflects the primary intention of the parties and to which all other covenants are collateral and secondary. By requiring that Aimee renounce all rights in certain estates and trust funds, Mrs. Taylor did not intend to deprive her of those benefits, but she did intend to foreclose her from any and all possibilities that might lead to the disclosure of the relationship of mother and daughter. The extent of Mrs. Taylor's concern in this all-important objective to her is plainly disclosed in subsection (g), article Third of the agreement, which is the renunciation covenant, wherein Aimee, after having renounced all rights under certain wills specifically identified in the six preceding subsections of that article, further renounced all right and claim under any other will or in or against any other estate "to the extent that any such right or claim might be predicated upon any relationship between the parties of the first and second parts", that is, Mrs. Taylor and Aimee as mother and daughter.

Furthermore, the *in terrorem* clause of the agreement is not to be passed by lightly in so far as it serves to disclose the dominant intention of the parties with reference to the real purpose of the agreement. Unless Aimee, following the making of the agreement, faithfully refrained from disclosing her relationship to Mrs. Taylor in any manner, she would lose the benefits of the trust that the mother had established under the agreement in return for her covenants of renunciation and nondisclosure of relationship. And, still further, to insure the maintenance of secrecy by

Aimee, Mrs. Taylor required that the covenant of nondisclosure continue in full force and effect after her death "for the benefit of her heirs, next of kin, devisees, legatees, and personal representatives". In the situation that we have outlined we are of the opinion that Aimee is entitled to one half of the principal of the trust in this case, provided that she faithfully observed her covenant of nondisclosure of her relationship to Mrs. Taylor.

This brings us to a consideration of Mrs. Taylor's affidavit of February 8, 1937. The question here, as in the matter of the agreement, is to ascertain Mrs. Taylor's intention in herself disclosing her relationship to Aimee in a formal way and for use as a public record. The testimony of Murray D. Welch, a member of the firm of lawyers that represented Mrs. Taylor for many years before her death and now represents the executor of her will, who was intimately acquainted with all matters involved in this case, sheds considerable light upon Mrs. Taylor's purpose in executing the affidavit.

Attorney Welch testified that sometime before 1937, his firm, acting for Mrs. Taylor, had been examining certain estates and trust funds for the purpose of substituting one or more trustees; that in the course of this investigation it was discovered that the Richard T. Parker trust, a fund from which Aimee was to get a portion under the agreement hereinbefore discussed, had shrunk considerably; and that when this information was conveyed to Mrs. Taylor and she was further informed that the laws of New York, in which state she resided, required that the names of the children of a deceased person be set forth in a petition for the probate of a will, Mrs. Taylor gave the affidavit in question and instructed her attorneys to make disclosure of Aimee's relationship to her when necessary.

We cannot conceive that Mrs. Taylor intended to do a nugatory act in making the affidavit in such circumstances. She apparently was a person of great circumspection in protecting herself against disclosure of an unfortunate incident in her life and she was equally concerned with

the comfort and welfare of her child, Aimee, for whom she believed she had made adequate provision under the agreement. But when she was informed that the provision which she had thus made for Aimee was endangered by the shrinkage of the Richard T. Parker trust, her love and affection for Aimee apparently impelled her to disclose, in a formal manner and for use as a public record, that which the agreement so carefully sought to conceal. In the circumstances, it is clear that she made the affidavit for the purpose and with the intention of assisting Aimee, rather than to preclude her from whatever benefits might accrue to her from the disclosure of relationship.

There is no doubt of Mrs. Taylor's love and affection for Aimee. Although assiduously refraining from communicating in any way directly with Aimee, she kept informed through her attorneys as to her daughter's situation and needs. For many years she voluntarily had substantial sums transmitted each year to Aimee. After the agreement was entered into she not only scrupulously observed the terms thereof but, again voluntarily and especially following the discovery of the shrinkage in the Richard T. Parker trust, she caused payments to be made to Aimee far in excess of those called for by the agreement.

Aimee also faithfully performed her part of the agreement. No act or word is attributed to her indicating that she violated its terms in any particular from the signing of the agreement to the death of her mother. The disclosure of her relationship to Mrs. Taylor was first made when the latter's will was offered for probate in New York, at which time or shortly thereafter such disclosure was also made by Mrs. Taylor's attorneys to the trustees of the Bourne will. In the proceedings for the probate of Mrs. Taylor's will, Aimee was cited to appear therein as a party in interest at the instance of the attorneys for the executor, and in the instant cause Aimee did not become a party until she had first consulted the executor of Mrs. Taylor's will and had received his unqualified consent to do so.

When the affidavit under discussion is considered in the light of all the circumstances, we are of the opinion that Mrs. Taylor thereby intended to and did release Aimee from the agreement in so far as it related to Aimee's conduct *after* her, Mrs. Taylor's, death. It is our judgment that Mrs. Taylor was firmly determined to conceal, so long as she lived, the relationship of mother and daughter; but that, for Aimee's protection, she was willing to waive the agreement as to the nondisclosure of that relationship following her death, thus allowing Aimee, if she deemed it to her advantage, to claim, as her daughter, rights in the various estates and trust funds mentioned in the agreement without incurring the penalty of the *in terrorem* clause thereof. In other words, Mrs. Taylor in effect waived that part of the agreement which made the nondisclosure covenant continue in full force and effect after her death "for the benefit of her heirs, next of kin, devisees, legatees, and personal representatives". This waiver, impliedly and necessarily, carried with it the renunciation covenant of the agreement, which covenant, as we have already stated, was incidental to and merely in aid of the dominant and primary purpose of the agreement, namely, the nondisclosure of relationship.

What we have said about the agreement and the affidavit in the case of Aimee applies with even greater force in the case of Mrs. Taylor's other daughter, Martha Sakrausky. Martha was not a party to any agreement, and, in so far as appears from the record before us, she never resided in this country and never knew that Mrs. Taylor was her mother.

For the reasons stated our conclusion is as follows: (1) Aimee Henry Michou and Martha Sakrausky are the children "by blood" of Martha M. Taylor; (2) that as such children Aimee Henry Michou and Martha Sakrausky are the only persons entitled to receive, share and share alike, the principal of the trust fund under the will of Mary M. Bourne; and (3) assuming that there has been a final determination according to law that Martha Sakrausky is an alien enemy, the attorney general of the United States is

now entitled to receive, as custodian, the share of Martha Sakrausky, which share shall hereinafter be dealt with by him according to law.

The parties may present to this court a form of decree, in accordance with this opinion, to be entered in the superior court.

Moss, J., did not participate in the decision.

*Sheffield & Harvey, William R. Harvey, J. Russell Haire,* for complainants.

*Ira Lloyd Letts, Andrew P. Quinn, Daniel J. Murray; Homer Franklin Carey,* Chicago; *Joseph Henry Cohen,* New York, for respondent Aimee Henry Michou.

*John F. Sonnett,* Assistant Attorney General, Washington; *George F. Troy,* U. S. Attorney, and *Edward M. McEntee,* Assistant U. S. Attorney; *Harry LeRoy Jones, Albert Parker,* Special Assistants to the Attorney General, Washington; *Elmer J. Kelsey,* Attorney, Claims Division, Department of Justice, Washington, for Tom C. Clark, Attorney General of the United States.

*Hinckley, Allen, Tillinghast & Wheeler, Frank L. Hinckley, Edward M. Watson,* for respondents Antonia DeLeon Cousino, Pedro F. Christophersen, Antonio Christophersen and Diego Christophersen.

*Burdick, Corcoran & Peckham, Edward J. Corcoran,* for respondent Susan Day Porotto, individually and as Executrix under will of Charles T. Parker.

*Hart, Gainer & Carr, Hoyt W. Lark,* for respondents George F. Lewis and Florence G. Tibbetts.