324 A.2d 657.

MARY A. GOUCHER vs. JOHN HANCOCK MUTUAL
LIFE INSURANCE COMPANY.

AUGUST 19, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

ROBERTS, C. J. This a civil action brought to recover
the proceeds of a contract of insurance entered into by

William F. Goucher, Jr., with the defendant, John Hancock Mutual Life Insurance Company. The plaintiff, Mary A. Goucher, wife of the insured, was the named beneficiary. The cause was tried on an agreed statement of facts by a justice of the Superior Court, who entered a judgment for the defendant. The plaintiff is now in this court prosecuting an appeal.

On September 28, 1970, the decedent applied for insurance with defendant. The application was in two parts. In Part A the decedent applied for a ten-year decreasing term life insurance policy which would initially pay the beneficiary $30,000. By checking the appropriate box, the decedent also indicated he applied for the policy at premium rates determined by the "standard" rather than by a "special" premium class. In Part B, which dealt primarily with the applicant's medical history, the decedent revealed that he had a history of diabetes. The decedent forwarded the application to defendant, together with a sum of $150, which was the quarterly premium for applicants placed in the "standard" premium class. In return, decedent was given a "conditional receipt."

As a result of the decedent's disclosure of a history of diabetes, he was requested to have his attending physician furnish defendant a diabetic statement and an electrocardiogram. Subsequently, the application was reviewed, and a determination was made to offer the decedent a Class B substandard policy. A policy, dated October 28, 1970, was prepared, indicating that the decedent would pay premiums according to a "special" premium class. The only difference between the policy applied for and the policy prepared was the premium rate. An amendment to the application, also dated October 28, 1970, was prepared indicating that the decedent was applying for rates according to a "special" premium class. Both the policy and the amendment were delivered to the decedent for his signa-

ture. On October 30, 1970, decedent indicated his acceptance of the substandard policy and forwarded his acceptance to defendant along with an additional $189.10, which was the balance due on the quarterly premium for the substandard policy.

It appears that on October 30, 1970, when the decedent signed the amendment, he was confined as a patient in Memorial Hospital. The decedent had consulted a psysician on October 24, 1970, and was admitted to the hospital on the following day. During his stay in the hospital a left colectomy was performed, and the decedent was discharged on November 15, 1970, with a diagnosis of carcinoma of the left colon with metastasis.[1]

At the time of the decedent's death,[2] which was December 9, 1971, all premium payments then due had been paid. As beneficiary, plaintiff was entitled to receive $27,960. In accordance with the terms of the policy, plaintiff presented defendant with due proof of death and surrendered the policy. However, defendant, denying that a contract of insurance ever came into existence, refused to pay on the policy and offered to refund $1,695.50 which had been paid on the policy by the decedent.

This dispute involves two provisions contained in the application and the conditional receipt. Agreement B of Part A (hereinafter Agreement B) of the application provided, in pertinent part:

> "If an advance payment is made * * * the contract of insurance shall take effect as provided in and subject to the terms and conditions of Conditional Receipt Form 156-CR-70 * * *. If the contract of

---

[1]The agreed statement of facts does not indicate, nor is it alleged, that the defendant through its agents had any knowledge regarding the decedent's hospitalization when the policy was issued.

[2]The record does not indicate whether the cause of the decedent's death was related to the diagnosis of carcinoma of the left colon.

insurance does not take effect as provided in such Conditional Receipt it shall take effect as of the Date of Issue of the policy but only upon delivery to and receipt by the Applicant of the policy and payment of the premium thereon, and only if at the time of such delivery and payment each person proposed for insurance in Parts A and B of this application, including the proposed Insured, is living and has not consulted, been examined, or treated by a physician or practitioner since the latest Part B pertaining to such person was completed."

The conditional receipt, Form 156-CR-70, provided, in pertinent part, as follows:

"Notice: Applicability of this Conditional Receipt is Governed by Agreement B of Application

"Conditional Receipt for Advance Payment with Application for New Insurance

"Received from ........................................... the sum of $............................... paid with application to the John Hancock Mutual Life Insurance Company bearing the same date and number as this Receipt. If this sum is at least 1 month's proportionate part of the premium according to the Company's published rates for the policy and premium interval selected in the application, and if the Company at its Home Office shall determine that each person proposed for insurance (including proposed insured) was on such person's 'Completion Date' acceptable under the Company's rules for the premium class, amount and plan of insurance, and additional benefits, if any, applied for, the contract applied for shall take effect retroactively as of the latest 'Completion Date', or of such other date as may be requested in the application and accepted by the Company, notwithstanding any change in any person's acceptability due to any disease contracted or injury sustained after such person's 'Completion Date'. Each person's 'Completion Date' shall be the date of completion of the latest of all Parts A and B and medical examinations and tests required for such person by the Company's published

underwriting requirements according to the age and the amount applied for."

The trial justice held that a contract of insurance never came into existence. He found that the application under the "standard" premium class was not accepted because of the decedent's past history of diabetes. He further found that a new proposal or counteroffer was made embodying the amendment with premium rates in a "special" premium class. The trial justice took the view that this counteroffer would have ripened into a contract upon the fulfillment of three conditions: (1) the decedent agreed to the amendment changing the premium class from "standard" to "special"; (2) the additional premium was paid; (3) the decedent was then living and had not consulted, been examined or treated by a physician since the latest Part B of the application had been completed. Since the decedent had consulted and been treated by a physician on October 24, 1970, the trial justice held that no contract came into existence.

In *John Hancock Mutual Life Ins. Co.* v. *Dietlin*, 97 R. I. 515, 199 A.2d 311 (1964), we delineated the general rules governing the formation of a contract of insurance. A contract of insurance, like any other contract, requires a manifestation of mutual assent in the form of an offer by one party which is accepted by the other party. An application for insurance is ordinarily an offer which must be unconditionally accepted before a contract comes into existence. Furthermore, an acceptance which is conditional is a counteroffer, and an acceptance of the condition by the original offeror is required to form a contract.

With these basic principles in mind, we have no doubt the decedent made an offer to enter into a contract of insurance when he forwarded the application, together with the first quarterly premium, to defendant. Furthermore, the refusal of the company to write a policy under

the "standard" premium class amounted to a rejection of the decedent's offer. However, when defendant forwarded the amendment to the application, changing the premium class from "standard" to "special," together with a policy prepared according to a special premium class rate, defendant made a counteroffer to the decedent.

The question presented is whether this counteroffer was accepted. The resolution of this question, however, depends upon what conditions, if any, were attached to the counteroffer and whether the decedent complied with the applicable conditions.

The application, together with the conditional receipt, sets out the conditions which had to be fulfilled before a contract could come into existence. According to Agreement B, the fulfillment of one of two sets of conditions would be sufficient to form a contract. First, if an advance payment was made, the first sentence of Agreement B provided that the contract would take effect according to the terms and conditions of the conditional receipt. Second, if no advance payment was made or if the contract did not take effect according to the conditional receipt, it was subject to the conditions delineated in the second sentence of Agreement B, which required, among other things, that the proposed insured has not consulted, been examined or treated by a physician since the latest Part B of the application was completed. For the sake of clarity, it should be emphasized that this second set of conditions is operative only in the event that the contract does not take effect according to the terms and conditions of the conditional receipt. Accordingly, by implication, the trial justice must have found that the first set of conditions was not applicable, because he based his decision on the second set of conditions.

Since the decedent made an advance payment of $150 when he submitted the application, in accordance with the

first sentence of Agreement B, it must first be determined whether the contract took effect according to the terms and conditions of the conditional receipt. The pertinent terms and conditions of the conditional receipt are as follows:

> "If this sum is at least 1 month's proportionate part of the premium according to the Company's published rates for the policy and premium interval selected in the application, and if the Company at its Home Office shall determine that each person proposed for insurance (including proposed insured) was on such person's *'Completion Date'* acceptable under the Company's rules for the premium class, amount and plan of insurance, and additional benefits, if any, applied for, the contract applied for shall take effect retroactively as of the latest *'Completion Date'* * * * notwithstanding any change in any person's acceptability due to any disease contracted or injury sustained after such person's *'Completion Date'*." (emphasis added)

An accurate and meaningful interpretation of the conditional receipt is, of course, dependent upon the meaning of the term "Completion Date." The conditional receipt provides that "[e]ach person's 'Completion Date' shall be the *date of completion of the latest of all Parts A and B and Medical examinations and tests* required [of the proposed insured] by the Company's published underwriting requirements according to the age and the amount applied for." (emphasis added) Clearly, Part A of the application, which contained the provision regarding the premium class selected, was not completed until the decedent signed the amendment to Part A on October 30, 1970. This date was the latest date of completion of all of Part A. As of that date, all of Part B had been completed, and the decedent had submitted to all medical examinations and tests required by defendant. Thus, the decedent's completion date for this transaction was October 30, 1970. This interpretation is in conformity with the well-settled

principle that the language used in an insurance policy must be given its plain, ordinary, and usual meaning. *Factory Mutual Liability Ins. Co.* v. *Cooper,* 106 R. I. 632, 262 A.2d 370 (1970); *Aldcroft* v. *Fidelity & Casualty Co.,* 106 R. I. 311, 259 A.2d 408 (1969); *Nagy* v. *Lumbermens Mutual Casualty Co.,* 100 R. I. 734, 219 A.2d 396 (1966); *Wolf* v. *Prudential Ins. Co.,* 62 R. I. 270, 4 A.2d 897 (1939); *Princess Ring Co.* v. *Home Ins. Co.,* 52 R. I. 481, 161 A. 292 (1932); *Grenon* v. *Metropolitan Life Ins. Co.,* 52 R. I. 453, 161 A. 229 (1932).

The conditional receipt, when read in light of this completion date, reveals that the contract of insurance would take effect on the completion date if (1) the advance payment made was at least one month's proportionate part of the premium rate selected in the application and (2) the proposed insured was, on his completion date, *i.e.,* October 30, 1970, acceptable under the Company's rules for the premium class, amount, and plan of insurance applied for. The first condition, which was the advance payment of one month's proportionate part of the premium, was fulfilled by the original payment of $150 on September 28, 1970.[3] The second condition, which required that the decedent, on his completion date, be acceptable to defendant under its rules for the premium class, amount, and plan of insurance applied for, was fulfilled when the decedent signed the amendment to the application. Obviously, if the decedent was not acceptable to defendant, it would not have offered him the substandard policy at a special premium rate.

[3]    To recapitulate, on October 30, 1970, defendant made a counteroffer to the decedent. The counteroffer was conditioned upon the decedent signing an amendment to the

---

[3]The original payment of $150 plus the additional payment of $189.10 add up to a total quarterly payment of $339.10 on the policy. Simple arithmetic reveals that each monthly payment would be about $113.

application, which changed the premium class selected from the standard to a special premium class. The decedent, being the counterofferee, had the power of acceptance. By signing the amendment and accepting the contract of insurance, the decedent did all that was required of him. As previously stated, Agreement B provided that the contract of insurance would take effect upon the fulfillment of one of two alternative sets of conditions. These two sets are found in the first and second sentences of Agreement B. In our opinion, the contract of insurance took effect according to the first sentence of Agreement B, which provided that if an advance payment were made, the contract would take effect according to the terms and conditions of the conditional receipt. Thus, the fact that the decedent had consulted and been treated by a physician on October 24, 1970, and had been admitted to Memorial Hospital, where an operation was performed, did not prevent a contract of insurance from coming into existence.[4] The second sentence of Agreement B, which provided that the contract would take effect only if the proposed insured had not consulted, been examined, or treated by a physician, is applicable only in the event that no advance payment has been made or if the contract did not take effect according to the terms and conditions of the conditional receipt. However, since an advance payment was made, and the contract did take effect according to the conditional receipt, the second set of conditions con-

---

[4] We might add that there is no evidence in the record which would indicate that the decedent in any way attempted to conceal the fact that he had consulted and been treated by a physician prior to signing the amendment.

tained in the second sentence of Agreement B is not applicable.[5]

Although it might be argued that the defendant, when it drafted the language contained in the conditional receipt, did not intend that it apply to the peculiar facts of this case, it is well settled that when the language employed by an insurer is ambiguous or susceptible to one or more reasonable interpretations, it will be strictly construed against the insurer. *Ricci* v. *United States Fidelity & Guaranty Co.*, 110 R. I. 68, 290 A.2d 408 (1972); *Factory Mutual Liability Ins. Co.* v. *Cooper, supra; Nagy* v. *Lumbermens Mutual Casualty Co., supra; Madsen* v. *Metropolitan Life Ins. Co.*, 90 R. I. 176, 156 A.2d 203 (1959); *Sherman* v. *New York Casualty Co.*, 78 R. I. 393, 82 A.2d 839 (1951).

The appeal of the plaintiff is sustained, the judgment below is reversed, and the cause is remanded to the Superior Court for further proceedings in accordance with this opinion.

Mr. Justice Kelleher, whom Mr. Justice Joslin joins, dissenting. I would affirm the findings made by the trial justice. The majority rests its reversal upon the term "completion date" while overlooking the truly significant portion of the receipt which provides retroactive coverage of the policy "applied for." It must be kept in mind that

---

[5]Of course, if the contract had not taken effect according to the conditional receipt, the fact that the decedent had consulted a physician would have prevented a contract from coming into existence. *See Girouard* v. *John Hancock Mutual Life Ins. Co.*, 98 R. I. 1, 199 A.2d 307 (1964).

the conditional receipt[1] given in September 1970 was in exchange for a premium that accompanied an application seeking "a select policy series with a standard premium class." The policy issued one month later differed from the one "applied for" in that it was a "substandard policy" having a *special premium class*. Hancock's conditional receipt specifically provides that no insurance will be effective until its home office determines whether under its rules the proposed insured is acceptable for the plan of insurance "applied for." Here, Goucher's diabetic background required Hancock in October 1970 to offer a policy with a rated-up premium. This was a counteroffer which rejected Goucher's earlier application and nullified the conditional receipt. *Dunford* v. *United of Omaha*, 95 Idaho 282, 506 P.2d 1355 (1973); *McLean* v. *Life of Virginia*, 11 N.C.App. 87, 180 S.E.2d 431 (1971); *U & I Properties, Inc.* v. *Republic National Life Ins. Co.*, 10 Wash. App. 640, 519 P.2d 19 (1974). Consequently, the abstention from medical treatment prior to delivery proviso became operative and bars recovery by the widow.[2]

---

[1]As might be expected, the use of "conditional receipt" has generated a great deal of litigation. The results reached varied depending in great part upon the terminology used by the receipt's draftsmen. *See* Annot., 2 A.L.R.2d 943 (1948) and its later case services.

Apart from its litigious aspects, the conditional receipt can prove a benefit to both the insurer and the proposed insured. By requiring a down payment prior to the insurer's determination of the applicant's insurability, the applicant is restrained both monetarily and psychologically from either revoking his offer to purchase or from purchasing the same insurance from another company. The receipt benefits the applicant because once a determination has been made to afford him coverage, any intervening change in his condition will not result in a lack of coverage. *See Brown* v. *Equitable Life Ins. Co.*, 60 Wis.2d 620, 211 N.W.2d 431 (1973).

[2]At the beginning of the conditional receipt is found the following:
"Notice: Applicability of this Conditional Receipt is Governed by Agreement B of Application."

Motion to reargue denied.

*Adler, Pollock & Sheehan, Incorporated, Peter Lawson Kennedy,* for plaintiff.

*John W. Moakler, John F. Sherlock, Jr.,* for defendant.