373 A.2d 810.
ELLIOTT LEASES CARS, INC. *vs.* EMMY L. QUIGLEY.

MAY 24, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

322

DORIS, J. Elliott Leases Cars, Inc. (plaintiff) brings this civil action to recover from Emmy L. Quigley (defendant) the cost of repairs to the plaintiff's automobile. The case was heard on stipulated facts by a Superior Court justice, sitting without a jury, on appeal from a judgment for the plaintiff rendered in District Court. The Superior Court justice entered judgment for the plaintiff, and the defendant now appeals. For the reasons which follow, we hold that the defendant's appeal must be sustained.

The plaintiff is a corporation engaged in the business of leasing automobiles. In March 1971, John Quigley, in his capacity as president of Rhode Island Buckle, Inc., leased an automobile from plaintiff. The defendant is the wife of an officer of said corporation. While driving the car with her husband's permission, defendant was involved in an accident. The defendant's negligence was stipulated to be the cause of the accident. The plaintiff brought suit against defendant for the total cost of repairing the car. The defendant denied liability on the ground that the lease contract obligated plaintiff to provide collision insurance for the benefit of defendant. The Superior Court justice, citing an explicit exemption contained in the contract, ruled that there was no obligation to provide collision insurance for accidents caused by the negligence of the operator of the leased automobile, and accordingly found defendant liable.

The issue before us on appeal is thus one of contract interpretation. We must decide first whether plaintiff was under a contractual duty to provide collision insurance without regard to negligence. If we find such a duty, we must then decide whether defendant may claim the benefit of such insurance.

I

The contractual relationship between plaintiff and defendant was embodied in two documents: a lease agreement, and a document entitled "Automobile Leasing Order." Both documents were standard forms prepared by plaintiff. Both dealt with the lease of the automobile in question. Each on its face appeared to recite all the terms of the transaction. Each was signed by both John Quigley and by plaintiff. Both were executed on March 22, 1971. Thus it is obvious that we cannot look to only one document or the other; the two together form the contract. To ascertain the scope of the agreement between the parties, we must construe each document in light of the other. 3 Corbin, *Contracts* §549 at 188 (1960).

The document which bore the boldface heading "Automobile Leasing Order" (the leasing order) was a single printed page in the nature of a summary of the transaction. The body of that document contained a description of the leased vehicle, the monthly rental rate and the mileage charge. It also contained a list of 18 items which were followed by a check mark in one of two columns; the first column was headed "HERE IS WHAT ELLIOTT PROVIDES", and the second, "HERE IS WHAT CUSTOMER PAYS FOR." Included in the items to be paid for by plaintiff was the following: "ACCIDENT RE-PAIRS — 100/deduct — Due to Collision (or Upset) per Accident." The defendant argues that this term constituted a promise on the part of plaintiff to provide collision insurance without regard to negligence.

The plaintiff argues in reply that the second document, the lease agreement, explicitly negated any obligation to provide insurance for accidents caused by the negligence of the driver of the leased car. The lease agreement consisted of 28 provisions in small print covering two full pages. Clause 2 of that agreement, upon which plaintiff relies, provided in part as follows:

> "Insurance and Indemnity. Lessee further agrees, with respect to each leased automobile, to:
>
> (a) Pay for any loss of or damage to the automobile not caused by employees of Elliott Leases Cars, Inc., hereinafter called "loss", to the extent of the actual amount thereof, or $100.00, whichever is the lesser, in the case of each loss except that:
>
> (i) if the loss is the result of any violation of the terms or conditions of this agreement or the result of careless, reckless or abusive handling of the automobile * * * Lessee shall be liable for the full amount of the loss without regard to the limitation of $100.00 * * *."

The case thus turns on the correct interpretation of these two provisions. Although the subject of this contract was the lease of an automobile, a significant part of the contract concerned insurance. The provision here in question related to insurance, as did 7 of the 18 items in the leasing order. For these reasons, and because the contract was, like most insurance contracts, a "form" contract that had many clauses prepared by the insurer and offered on a take-it-or-leave-it basis, we feel that the appropriate interpretive principles are those normally applicable to insurance contracts.

In interpreting such contracts the terms used should be given their plain, ordinary and usual meaning. *Aldcroft v. Fidelity & Cas. Co.*, 106 R.I. 311, 259 A.2d 408 (1969). If there remains any doubt, the terms should be read in

the sense which the insurer had reason to believe they would be interpreted by the ordinary reader and purchaser. The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean. *Goldstein* v. *Occidental Life Ins. Co.*, 108 R.I. 154, 273 A.2d 318 (1971); *Joslin* v. *Aetna Life Ins. Co.*, 67 R.I. 261, 21 A.2d 550 (1941). In this case, the leasing order provided that plaintiff would pay for "accident repairs" caused by collision or upset, subject to a $100 deductible. The ordinary reader would not assume that an unqualified promise of this nature only covered accidents not caused by the negligence of the operator of the automobile. Indeed just the opposite is true. Collision insurance is generally understood to cover whatever accidents occur, regardless of the negligence of the operator. An exclusion which limits coverage to nonnegligent accidents significantly reduces the scope of the insurance. Not only does it reduce the total number of accidents covered, but it eliminates coverage in precisely those cases in which it is most needed — that is, where there may be no negligent tortfeasor from whom the insured may recover. The ordinary reader of the leasing order provision would therefore assume that collision insurance was provided without regard to negligence.

The context in which this provision appeared would be likely to strengthen this impression. The leasing order described seven separate categories of insurance which plaintiff was to provide: physical damage insurance to cover "fire, theft and comprehensive" and to cover collision or upset; accident repairs due to fire and theft, due to collision or upset ($100 deductible), and due to glass breakage ($25 deductible); personal liability insurance in the amount of "$100,000/$300,000"; and property damage insurance in the amount of $50,000. The latter amount was typewritten, the original printed figure of $25,000

having been cancelled by a series of typewritten "X's". The abundant detail and the apparent care with which insurance coverage was described would suggest that all relevant terms were included. The ordinary reader, in the face of such detail, would be warranted in concluding that any significant limitation on collision insurance would have been explicitly noted. This is particularly true where, as here, such a limitation could be very easily expressed, as for example by the insertion of the word "nonnegligent" in the relevant provision. We therefore conclude that the provision in the leasing order concerning collision insurance must be interpreted as a promise by plaintiff to provide collision insurance without regard to the negligence of the operator of the leased vehicle.

Having reached this conclusion, however, we find ourselves faced with an additional problem of interpretation. As noted above, the leasing order and the lease agreement must be construed together. There is no doubt that the lease agreement, even when read as it would be by the ordinary reader, quite clearly and unequivocally purports to exclude negligently caused accidents from the collision insurance coverage. We are thus faced with a situation where a prominent provision of the contract which would lead the average reader to reasonably conclude that he was insured against certain risks was explicitly contradicted by an admittedly unequivocal provision contained in the fine print of a less apparent provision.

One well-accepted mode of analysis used in the resolution of conflicting contract provisions is that a general provision must yield to a more specific one. E.g., Greene v. Cheetham, 293 F.2d 933, 936 (2d Cir. 1961); National Ins. Underwriters v. Carter, 17 Cal.3d 380, 131 Cal.Rptr. 42, 551 P.2d 362 (1976). In the present case the provision in the leasing order which provided for insurance was much less specific than the conflicting exclusionary clause

in the lease agreement. Applying the above rule, the exclusionary clause should control.

However, we do not think that rule appropriate in this situation. The rationale behind it is that when parties deal with particular objects or situations, they are more likely to know what they are talking about and to say what they mean. 3 Corbin, *Contracts* §547 at 176-78 (1960). While this inference may be valid in situations where the contract is the result of an actual bargaining process, to suppose that such an inference may be made in this case is unrealistic. The defendant did not play any part in drafting the general *or* the specific provision. Both were contained in "form" contracts drafted entirely by plaintiff. Moreover, the general provision appeared prominently in the lease order, while the specific was buried in two pages of fine print. In such circumstances we cannot presume that the specific provision was a more accurate expression of the intent of the parties.

In our opinion, the facts which bear the most significant relation to the proper interpretation of this contract are those mentioned above that the contract was drafted by plaintiff, and that on its face it appeared to provide the coverage here in dispute. The rule of construction which we therefore find controlling is that ambiguous or conflicting provisions will be construed against the author of those provisions. *Zifcak* v. *Monroe*, 105 R.I. 155, 159, 249 A. 2d 893, 896 (1969). This rule is especially appropriate with respect to contracts of insurance, which we have in the past characterized as contracts of adhesion. *Pacheco* v. *Nationwide Mut. Ins. Co.*, 114 R.I. 575, 337 A.2d 240 (1975); *Pickering* v. *American Employers Ins. Co.*, 109 R.I. 143, 282 A.2d 584 (1971). It is well-established that ambiguities therein will be construed so as to bear most heavily against the insurer. *Goucher* v. *John Hancock Mut. Life Ins. Co.*, 113 R.I. 672, 681, 324 A.2d 657, 662

(1974); *Nagy* v. *Lumbermens Mut. Cas. Co.*, 100 R.I. 734, 740, 219 A.2d 396, 400 (1966). The operation of the rule in cases such as the one at bar is summarized quite well in *Seal* v. *Tayco, Inc.* 16 Utah 2d 323, 326, 400 P.2d 503, 505 (1965). There, in limiting the scope of a contractual provision which purported to exclude recovery of any special or consequential damages, the court said:

> "[I]n case of uncertainty as to the meaning of the contract, it should be construed most strictly against its framer, Amsco. A particularized application of this well-recognized doctrine is that it seems manifestly unfair to permit one who formulates a contract to so fashion it as to mislead the other party by setting forth a clearly apparent promise or representation in order to induce acceptance, and then designedly 'burying' elsewhere in the document, in fine print, provisions which purport to limit or take away the promise, and/or preclude recovery for failure to fulfill it."

We think the same rationale applies here. It is common knowledge, and so should have been known to plaintiff, that the detailed provisions of insurance contracts are seldom read by consumers. *C & J Fertilizer, Inc.* v. *Allied Mut. Ins. Co.*, 227 N.W.2d 169 (Iowa 1975). *See generally* Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529 (1971). The plaintiff should have known that the leasing order, which was a simple, highly readable summary of the transaction, would be relied upon by its customers. The plaintiff could easily have avoided any ambiguity in the contract, and hence avoided creating a reasonable expectation of coverage, by noting the exclusion of negligence on the face of the leasing order. Accordingly, we must interpret the contract against plaintiff so as to give effect to plaintiff's apparent unconditional promise to provide col-

lision insurance, and disregard the attempted exclusion.[1] We hold therefore that the contract between plaintiff and John Quigley obligated plaintiff to provide collision insurance without regard to negligence.

## II

The question remains whether defendant has any right to claim the benefit of this obligation. We hold that she does have such a right.

There is no question that a third party beneficiary may sue on a contract made for his benefit. Here, there was no suggestion in the contract that the defendant was not intended to be such a beneficiary. To the contrary, applying the "ordinary reader and purchaser" standard described above, the leasing order must be interpreted to provide collision insurance for the lessee *and* those driving the leased automobile with his permission. There was nothing

---

[1]We note that the result we have reached is consistent with the position adopted in a growing number of jurisdictions that the objectively reasonable expectations of one who enters a contract of adhesion will be enforced, despite the existence of contrary contract provisions. In a leading article on the subject the emerging principle is stated as follows:

"The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L.Rev. 961, 967 (1970).

*See INA Life Ins. Co.* v. *Brundin*, 533 P.2d 236 (Alaska 1975); *Smith* v. *Westland Life Ins. Co.*, 15 Cal.3d 111, 123 Cal.Rptr. 649, 539 P.2d 433 (1975); *Corgatelli* v. *Globe Life & Accident Ins. Co.*, 96 Idaho 616, 533 P.2d 737 (1975); *C & J Fertilizer, Inc.* v. *Allied Mut. Ins. Co.*, 227 N.W.2d 169 (Iowa 1975); *Magulas* v. *Travelers Ins. Co.*, 114 N.H. 704, 327 A.2d 608 (1974); *Bryan Constr. Co.* v. *Employers' Surplus Lines Ins. Co.*, 60 N.J. 375, 290 A.2d 138 (1972). In the present case there is no need to pass on the general validity of the above rule of law, and reference to the foregoing cases is not intended as an unequivocal endorsement. We do feel, however, that those cases reflect the importance which should be attached to the objectively reasonable expectations of purchasers in situations such as that presented in the case at bar.

in the leasing order to put the lessee on notice that the coverage applied only to him personally. Moreover, since the lessee signed in his capacity as president of a corporation, the plaintiff could infer with reasonable certainty that persons other than the lessee himself would drive the automobile. Therefore, in accordance with the principles discussed earlier in this opinion, we find that the contract obligated the plaintiff to provide collision insurance for the benefit of the defendant. The plaintiff is not entitled to recover from the defendant the full cost of the automobile repairs, but to recover only the deductible of $100.

The defendant's appeal is sustained, the judgment appealed from is reversed, and the cause is remanded to the Superior Court with directions to enter judgment in accordance with this opinion.

Mr. Justice Joslin, with whom Mr. Justice Kelleher joins, dissenting. This case involves the interpretation of two writings. Because both are a part of a single transaction, they are to be considered together as if they were but a single instrument. Restatement (Second), *Contracts* §228(2) (Tent. Drafts Nos. 1-7, rev. & edited 1973). One, labeled "Automobile Leasing Order," consists of a single page, is printed in type of varying sizes, is generally triple-spaced, and contains a summary of the essential elements of the transaction. The other, captioned "Full Maintenance Lease No. ................," is single-spaced, printed in uniform-sized type that is generally smaller than that used in the order, and details with specificity the terms and conditions of the agreement between the parties.

Each writing contains a provision concerning damage to the leased vehicle resulting from a collision caused by the lessee's negligence. The majority and I agree that the lease does not require Elliott to carry collision insurance covering such damage, but they say that the order does.

I believe that in so concluding they misread the order. In the interest of narrowing the area of disagreement, however, I am willing to assume that the provisions of the two writings do conflict. The question remains which of the two conflicting provisions shall prevail.

The problem thus becomes one of interpretation; the objective is to ascertain the intention of the parties and give effect thereto insofar as possible and as the law will permit. *Hill* v. *M.S. Alper & Son, Inc.,* 106 R.I. 38, 47, 256 A.2d 10, 15 (1969); *Fiduciary Trust Co.* v. *Michou,* 73 R.I. 190, 198, 54 A.2d 421, 425 (1947); *Pawtucket Mach. & Supply Corp.* v. *Monroe,* 73 R.I. 162, 164, 54 A.2d 399, 400 (1947). The intent sought is that which is discernible from the language of the instrument and not some undisclosed intention that the parties may have had in mind. *Pawtucket Mach. & Supply Corp.* v. *Monroe, supra* at 164-65, 54 A.2d at 400.

Among the rules of interpretation, or "standards of preference,"[1] that serve as guides in ascertaining the meaning of a contract is one that calls for the more limited and specific of two conflicting provisions to operate as a "modification and pro tanto nullification" of a more general and broadly inclusive provision. 3 Corbin, *Contracts* §547, at 176 (1960); *accord, Antonio Marcaccio, Inc.* v. *Santurri,* 51 R.I. 440, 442, 155 A. 571, 572 (1931). The underlying rationale for this standard is that

> "[a]ttention and understanding are likely to be in better focus when language is specific or exact, and in case of conflict the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language." Restatement (Second), *Contracts, supra,* §229, Comment e, at 517-18; *accord,* 3 Corbin, *supra,* §547, at 176-78.

---

[1] Restatement (Second), *Contracts* §229 (Tent. Drafts Nos. 1-7, rev. & edited 1973), uses the term "standards of preference" in this context instead of rules of interpretation.

The majority acknowledge this standard, but say that it is inapposite in this case because (1) "the general provision appeared prominently in the lease order, while the specific was buried in two pages of fine print." 118 R.I. at 328, 373 A.2d at 813; and (2) the writing contains provisions relating to insurance and therefore should be construed as if it were an insurance contract and consequently interpreted *contra proferentem*—against Elliott, the party that drafted both writings.

I find that rationale completely untenable. In the first place, it is unreasonable to impute to the parties an intention that the broadly inclusive terms of the order, which is merely a summary of the agreement, should under any circumstances override the lease's detailed provisions. To hold that the parties so intended simply abrogates the lease to the extent that it contains anything not found in the order.

Secondly, I cannot possibly agree that the inclusion of a few provisions relating to insurance in an ordinary, run-of-the-mill automobile lease will, ipso facto, convert that writing into an insurance contract and thereby, according to the majority, require "that the appropriate interpretive principles [be] those normally applicable to insurance contracts." 118 R.I. at 325, 373 A.2d at 812. The majority cite no authority for that pronouncement, nor am I aware of any. Moreover, were that the controlling rule, the inclusion of insurance provisions in such routine form contracts in common everyday use as leases of real or personal property, security and loan agreements, bailment contracts and the like would cause those contracts to be deemed insurance contracts for interpretative purposes. I can perceive of no sound reason for applying the special rules for interpreting insurance contracts — rules which in general lean rather heavily against the insurer — to such a broad range of commercial transactions.

Finally, the rule of interpretation *contra proferentem* "is to be applied only as a last resort. It should not be applied until other rules of interpretation have been exhausted * * *." 3 Corbin, *supra*, §559, at 268; *accord, e.g., Gulf Ref. Co.* v. *Home Indem. Co.*, 78 F.2d 842, 843-44 (8th Cir. 1935); *Decter* v. *Stevenson Properties, Inc.*, 39 Cal. 2d 407, 418, 247 P.2d 11, 17 (1952); *American Lithographic Co.* v. *Commercial Cas. Ins. Co.*, 81 N.J.L. 271, 274, 80 A. 25, 26 (1911). Yet in the present case the majority resort to the standard of "last resort" even though the rule that specific provisions qualify general ones is available and would, if invoked, completely resolve the conflict. Furthermore, as Professor Corbin points out,

"[t]he rule [of interpretation *contra proferentem*] is hardly to be regarded as truly a rule of interpretation; its application does not help to determine the meaning that the two parties gave to the words, or even the meaning that a reasonable person would have given to the language used. It is chiefly a rule of public policy, generally favoring the under dog." 3 Corbin, *supra*, §559, at 268-70.

Thus, the majority reject a rule that at least attempts to express the intent of the parties in favor of one that does not. The reason for their choice apparently lies in their plainly expressed partiality for larger-sized print. I am not aware, however, of any public policy in this state against the use of fine print in contracts, particularly when the print used is not so fine as to be either unreadable without magnification or readable only with difficulty.[2] The majority's insistence that Elliott could have avoided any ambiguity by noting the negligence exclusion on the

---

[2]To the untrained eye, the size of the type used in the lease appears to be essentially the same as that of the headnotes and footnotes in the official reports of our decisions and the "Notes to Decisions" of the 1956 General Laws.

face of the order seems to mean nothing more or less than that the whole agreement should have been set forth in the order because it was printed in larger type than the lease. But the whole agreement was not set forth in the order, and I see no warrant for abrogating provisions of the lease simply because they are in smaller print than are those in the order. That is the kind of sweeping public policy determination that should be made, if at all, by the Legislature.[3]

In my judgment, the majority's expressed solicitude for consumers is irrelevant to the resolution of this cause. In particular, their statement that "the detailed provisions of insurance contracts are seldom read by consumers," 118 R.I. at 329, 373 A.2d at 813, is strikingly inapposite to the present context. I repeat that this is not an insurance contract. It is a commercial automobile lease, signed by a businessman — who presumably had his eyes open when he signed it — in his capacity as a corporate president. I would hold him to his bargain by affirming the judgment of the Superior Court.

*Lovett & Linder, Ltd., Stephen G. Linder,* for plaintiff.

*Pucci & Goldin, Samuel A. Olevson,* for defendant.

---

[3]For example, the Uniform Commercial Code, G.L. 1956 (1969 Reenactment) §6A-2-316(2), provides that a written disclaimer of warranty must be "conspicuous," and §6A-1-201(10) defines that term.