**ALLSTATE INS. CO.**

v.

**Robert P. RUSSO and Armand G. DiNapoli.**

**Civ. A. No. 91–0510B.**

United States District Court, D. Rhode Island.

July 30, 1993.

John H. Blish, Stephen J. Reid, Jr., Blish & Cavanagh, Providence, RI, Peter J. Valeta, Ross & Hardies, Chicago, IL, for Allstate Ins. Co.

Richard R. Beretta, Peabody & Arnold, Providence, RI, Raymond A. Marcaccio, Providence, RI, for Robert P. Russo.

Eva Marie Mancuso, Hamel, Waxler, Allen & Collins, Providence, RI, for Armand G. DiNapoli.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

This is a diversity case, 28 U.S.C. § 1332, governed by the substantive law of Rhode Island. Plaintiff Allstate Insurance Co. (Allstate) seeks a declaration that it is not obligated to defend or indemnify defendants Robert P. Russo and Armand G. DiNapoli under certain insurance policies. Defendants Russo and DiNapoli counterclaim seeking a declaration that Allstate is obligated to defend or indemnify them under these insurance policies. Although the precise legal issues are of the usual type, the circumstances under which the issues arise present a possibility of wide ranging results from the resolution of the issues. The defendants are two former directors of Central Credit Union, one of a number of credit unions located in the State of Rhode Island which have been taken over by the state because of their precarious financial conditions. The take over followed the financial collapse of the vehicle created to insure deposits of member credit unions. This case presents questions with wide spread public implications and some legal issues as to which this court has found no directly controlling Rhode Island precedent. As a result, this court decides certain issues and certifies other questions to the Rhode Island Supreme Court pursuant to Rhode Island Supreme Court Rule 6.

### I. Background.

The parties have stipulated to the following facts. Defendants have been sued in connection with the collapse of Central Credit Union (hereinafter CCU) during the Rhode Island Credit Union crisis in January 1991. Defendant DiNapoli became manager of CCU in 1978. DiNapoli's annual salary as manager rose from $12,000 in 1978 to $50,000 plus benefits at the time CCU went into receivership in January of 1991. In 1979, DiNapoli was elected to the CCU Board of Directors and also elected Treasurer of CCU. As a Board member, DiNapoli received between $15.00 and $40.00 for each meeting of the Board of Directors he attended. DiNapoli had invested his life savings, approximately $50,000, in deposit or share accounts at CCU.

Defendant Russo was elected to the CCU Board of Directors in 1982. Russo attended approximately 9 meetings of the CCU Board of Directors each year and received $20.00 to $40.00 for each meeting attended. Russo's principle occupation was as an Allstate sales agent in East Greenwich, Rhode Island. Russo had invested between $8,000 and $11,000 in deposit or share accounts at CCU. Russo also had received loans totalling $150,000 from CCU to finance his Allstate sales office.

In January of 1991, CCU was placed into receivership. Later in 1991, CCU depositors filed a series of actions in Rhode Island Superior Court naming, among others, DiNapoli and Russo, in their respective capacities as officers and/or directors of CCU, as defen-

dants. To manage this litigation, a pretrial order required all plaintiffs in actions arising out of the failure, closing, and receivership of CCU to file a superseding consolidated complaint (Master Complaint). Accordingly, on April 16, 1991, the Master Complaint was filed against all officers and directors of CCU, including defendants DiNapoli and Russo. This is one of fifteen Master Complaints consolidating over one hundred (100) lawsuits.

At the time the original complaints against the defendants were filed, each of the defendants were insured by two policies issued by Allstate. Russo was insured under an Allstate Deluxe Plus Homeowners Insurance Policy. On this policy, Russo had added optional coverage for specified business pursuits and had specified "salesman without installation" as the business pursuit covered. DiNapoli also held an Allstate Deluxe Homeowners Policy. Unlike Russo, however, DiNapoli added no optional coverage to his policy. Russo and DiNapoli were each the named insured on separate Allstate Personal Umbrella Policies (PUPs). On his PUP application, Russo listed his position as a member of the CCU Board of Directors in response to a question asking him to list public, educational or charitable boards of which he was a member. Defendants paid all premium payments for all of the policies and Allstate accepted the payments. On February 19, 1991, Russo submitted a claim to Allstate under his policies. Likewise, on February 22, 1991, DiNapoli submitted a claim to Allstate under his policies. As a result of these claims, Allstate has brought this action for declaratory judgment. The stipulated facts and joint exhibits are included in the attached record.

## II. Discussion.

■ Both parties seek a declaratory judgment concerning whether or not Allstate has a duty to defend or indemnify DiNapoli and Russo. As a general rule, "a duty to defend arises when the complaint in the underlying tort action contains facts sufficient to bring the case within or potentially within the coverage of the policy, regardless of whether the plaintiffs in the tort action will prevail on the merits." *Hingham Mutual Fire Ins. Co. v. Heroux*, 549 A.2d 265, 266 (R.I.1988). Therefore, "[b]y negative implication, [an] insurer has no duty to defend the insured against loss of [a] nature and kind ... not within the coverage of the policy." *Allstate Ins. Co. v. LaPore*, 762 F.Supp. 268, 270 (N.D.Cal.1991). This court decides the issues presented under the Homeowners Policies in Part A of the Discussion. In addition, the court certifies to the Rhode Island Supreme Court questions concerning both the scope of coverage and available exclusions under the Personal Umbrella Policies. The extent of the relevant law discovered by this court is set forth in Parts B and C of the Discussion.

### A. The Homeowners Policies.

■ Allstate is entitled to declaratory judgment with regard to defendants' claims made under their Homeowners Policies.[1] Under Rhode Island law, "[t]he language used in the policy must be given its plain, ordinary, and usual meaning." *Malo v. Aetna Casualty and Surety Co.*, 459 A.2d 954, 956 (R.I.1983). Accordingly, "[w]hen the terms are found to be clear and unambiguous, ... [they] must then be applied as written and the parties are bound by them." *Id.*

Each of the Homeowners Policies provides that "Allstate will pay damages which an insured person becomes legally obligated to pay because of *bodily injury* or *property damage* arising from an accident." (Joint Exhibits 5 and 6, p. 23.) (emphasis added). The policies define "bodily injury" as meaning "physical harm to the body, including sickness or disease, and resulting death." *Id.* at 3. This definition of "bodily injury" is unambiguous and, as a result, the language must be given its plain, ordinary meaning. *See Malo v. Aetna Casualty and Surety Co.*, 459 A.2d at 956. In addition, several courts

---

1. It is not entirely clear whether defendants have abandoned their arguments under their Homeowners Policies. Defendants made no arguments concerning the Homeowners Policies at oral argument. Because DiNapoli and Russo did file claims under their Homeowners Policies and because both parties moved for declaratory judgment as to these policies, the court addresses the issue.

have construed the meaning of the term "bodily injury" in insurance policies. *See Chatton, et al. v. Nat'l Union Fire Ins. Co.,* 10 Cal.App.4th 846, 854, 13 Cal.Rptr.2d 318 (1992) (listing numerous cases construing "bodily injury"). The weight of authority holds that "bodily injury" refers only to physical injury to the body and not nonphysical, emotional or mental damage. *Id.* "[W]here a term has been judicially construed, it is not ambiguous, and courts should apply the judicial construction given in previous decisions." *Allstate Ins. Co. v. LaPore,* 762 F.Supp. 268, 270 (N.D.Cal.1991). Although the Master Complaint prays for "actual and consequential damages" and "other and further relief that th[e] court deems just and proper," none of the allegations even remotely assert that the plaintiffs suffered "bodily injury" as defined by the Allstate Homeowners Policies. (Joint Exhibit 4, p. 70.) Accordingly, no coverage exists under the "bodily injury" provision.

 "Property damage," as defined by the policies, "means physical injury to or destruction of *tangible property,* including loss of its use resulting from such physical injury or destruction." (Joint Exhibits 5 and 6, p. 4.) (emphasis added). Under this definition therefore, the Master Complaint plaintiffs suffered "property damage" only if the funds that plaintiffs entrusted to CCU constitute "tangible property." The Master Complaint characterizes the plaintiffs' losses as lost deposits or investments. (Joint Exhibit 4, p. 29) The general rule is that loss of investment is purely economic loss and not injury to or destruction of tangible property. *See Hartford Accident & Indemnity Co. v. Case Foundation Co., et al.,* 10 Ill.App.3d 115, 122–124, 294 N.E.2d 7, 13–14 (1973). Furthermore, funds characterized as invest-

ments are analogous to funds deposited in a bank. *Travelers Indemnity Co. v. State of Arizona,* 140 Ariz. 194, 196, 680 P.2d 1255, 1257 (1984). Bank deposits create a debtor-creditor relationship between the bank and the depositor. *White Rock Nat'l Bank of Dallas v. United States Fire Ins. Co.,* 562 S.W.2d 268, 273–74 (Tex.Civ.App.1978). A deposit, therefore, is not held in specie in the bank's vaults for the depositor, but rather is an intangible chose in action.[2] *Somers v. Snihur,* No. 282304, 1991 WL 25663, at *2 (Conn.Super.Ct., Feb. 5, 1991). Because neither lost investments nor lost deposits are "tangible property," as defined by the Homeowners Policies, no coverage exists under the "property damage" provision. Accordingly, because no coverage exists under either the "bodily injury" or "property damage" provisions, a judgment should enter declaring that Allstate is not obligated, under either of the Homeowners Policies, to defend or indemnify Russo[3] or DiNapoli. *See Mellow v. Medical Malpractice Joint Underwriting Ass'n,* 567 A.2d 367, 368 (R.I.1989).

### B. The Personal Umbrella Policies—Scope of Coverage.

 The parties also seek a declaratory judgment as to coverage under the Personal Umbrella Policies (PUPs) held by defendants Russo and DiNapoli. The PUPs provide, in pertinent part, that: "Allstate will pay when an insured becomes legally obligated to pay for **personal injury** or **property damage** caused by an **occurrence**" (Joint Exhibit 7, p. 4.) "Property damage" is defined substantially the same under both the Homeowners Policies and the PUPs. As a result, for the reasons set forth above, no coverage exists under the "property damage" provision of the PUPs.

**2.** A bank deposit specifically labelled as a "special deposit" is "the traditional designation of the bailment or agency or trust whereby the bank keeps or transmits identical property or funds entrusted to it [and] [t]he usual creditor-debtor relationship does not arise." *White Rock Nat'l Bank of Dallas v. United States Fire Ins. Co.,* 562 S.W.2d 268, 273 (Tex.Civ.App.1978). The Master Compliant makes no reference to "special deposits" in its claims for damages.

**3.** Optional Coverage P extended the Family Liability Protection of defendant Russo's Home-

owners Policy to cover specified business pursuits. Russo specified "salesman without installation" (referring to Russo's occupation as an Allstate salesman) as the business pursuit for which he sought coverage. None of the Master Compliant claims against Russo arise from his occupation as an Allstate Insurance salesman. Accordingly, Russo's Optional Coverage P does not provide coverage for any of the underlying claims in the Master Complaint.

The PUPs define "personal injury", in pertinent part, as: "c) libel; slander; *misrepresentation;* humiliation; defamation of character; [and] invasion of rights of privacy." (Joint Exhibit 7, p. 2.) (emphasis added). Because the Master Complaint contains counts for both intentional and negligent misrepresentation,[4] the defendants seek coverage under the PUPs' "personal injury" provisions.

■ Defendants argue that the term "misrepresentation" is clear and unambiguous and should be given its plain meaning, a meaning that provides coverage for economic loss of the type alleged by the Master Complaint plaintiffs. *See B & D Appraisals v. Gaudette Machinery Movers,* 752 F.Supp. 554, 557 (D.R.I.1990). In support of this argument, defendant DiNapoli offers a Restatement of Torts definition of negligent misrepresentation which closely mirrors the allegations in the Master Complaint.[5] In the alternative, defendants argue that any ambiguity in the term "misrepresentation" must be construed against Allstate. Under Rhode Island Law it is clear that "if the language employed in the policy is ambiguous or susceptible of one or more reasonable interpretations, it will be construed in favor of the insured." *See Bush v. Nationwide Mutual Ins. Co.,* 448 A.2d 782, 784 (R.I.1982). A court should not, however, "through an effort to seek out ambiguity where there is none, make either party assume a liability not imposed by the policy." *Id.*

At least one commentator has observed that "misrepresentation ... runs *all through the law of torts,* as a method of accomplishing *various types of tortious conduct* which ... usually are *grouped under categories* of their own." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 105, at 725 (5th ed. 1984) (emphasis added). In fact, difficulty often arises in connection with the term "misrepresentation" because of "a failure to distinguish the requisites of the action in tort at law from those of equitable remedies, and to distinguish the different forms of misrepresentation from one another." *Id.* at 727. As a result, the term "misrepresentation", "has been merged to such an extent with other kinds of misconduct that neither the courts nor legal writers have found any basis to regard it as *a separate basis of liability.*" *Id.* at 726 (emphasis added). Accordingly, if the defendants' argument is adopted, the "misrepresentation" clause would expose Allstate to liability not only for misrepresentation of the species contained in the Master Complaint, but also for a variety of torts against both tangible and intangible interests. *See id.* at 725–26.

Plaintiff argues that the court should apply the doctrine of construction known as "ejusdem generis" to limit the broad meaning of "misrepresentation." Black's Law Dictionary explains the "ejusdem generis rule" as meaning "that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." *See also* George J. Couch

---

4. Master Complaint Count IX and Count X against the Credit Union defendants. (Joint Exhibit 4, pp. 37–38.)

5. Section 552 of the Restatement of Torts 2d defines negligent misrepresentation as:

(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining and communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered:
(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.
*Restatement (Second) of Torts* § 552 (1977).

et al., *Couch on Insurance* 2d § 15.71 at 325 (Rev. ed. 1984). The "personal injury" provision in question in the Allstate PUP, however, seems incompatible with a classic application of the "ejusdem generis" rule. Generally, courts apply "ejusdem generis" to statutory or contract language where general language *follows* an enumeration of specific terms. *See, e.g., Waranch et al. v. Gulf Ins. Co.*, 218 Cal.App.3d 356, 359, 266 Cal.Rptr. 827 (1990) (enumerated list of specific torts followed by general language "or other invasion of the right of private occupancy").

Here, the general term "misrepresentation", which carries a very broad meaning, is included in the midst of an enumeration of torts. The situation in this case appears better suited to an application of the closely related doctrine of "noscitur a sociis" which means "it is known from its associates." Norman J. Singer, *Sutherland Stat. Const.* § 47.16 at 183 (5th ed. 1992 Rev.). The current explication of this principle is the oft-quoted observation that "one is known by the friends he or she keeps." Under "noscitur a sociis," "when two or more words are grouped together, and ordinarily have a similar meaning, but are not equally comprehensive, the general word will be limited and qualified by the special word." *Id.* Both "ejusdem generis" and "noscitur a sociis" have been employed as rules of construction under Rhode Island law. *See Members of the Jamestown School Comm. v. Schmidt et al.*, 122 R.I. 185, 191, 405 A.2d 16, 20 (1979) (applying "noscitur a sociis" in context of statutory construction); *see also Shulton, Inc. v. Apex, Inc.*, 103 R.I. 131, 135, 235 A.2d 88, 91 (1967) (recognizing application of "ejusdem generis" in context of contract interpretation); *In re Opinion of the Governor*, 90 R.I. 135, 138–39, 155 A.2d 602, 604 (1959) (applying "ejusdem generis" in context of statutory construction). Under "noscitur a sociis", the term "misrepresentation" would be limited and qualified by the torts of libel, slander, humiliation, defamation of character; and invasion of rights of privacy, which are listed along with it. Because these torts all represent invasions of personal or relational, and not economic, interests, application of this doctrine would seem to dictate that the term "misrepresentation" should not be con-

strued to embrace the allegations of economic injury in the Master Complaint. *See Waranch et al. v. Gulf Ins. Co.*, 218 Cal.App.3d at 359, 266 Cal.Rptr. 827 (construing other listed torts as limiting the term "other invasion of the right to private occupancy" to invasions of real property interests); *see also Allstate Ins. Co. v. LaPore*, 762 F.Supp. at 271 (torts such as defamation impair a "relational" interest).

Plaintiffs further argue that the overall tone of the PUPs bolsters this strict construction of the term "misrepresentation". The coverage and exclusions in the PUPs repeatedly limit the scope of the policy to personal activities and injuries. Furthermore, the PUPs do not include torts, such as deceit, which generally result in injury of an economic nature, in any of the four lists of injuries and torts that define "personal injury." Given that "[a] policy is not to be described as ambiguous because a word is viewed in isolation," plaintiffs argue that the tone of the PUPs, coupled with an application of the above doctrine of construction eliminates any ambiguity and compels a construction of the term "misrepresentation" in favor of the plaintiffs. *See McGowan v. Connecticut Gen. Life Ins. Co.*, 110 R.I. 17, 18, 289 A.2d 428, 429 (1972).

## C. The Business Activities Exclusions.

The PUPs contain two express business activities exclusions. First, the PUPs state that they do not apply "to any act, or failure to act, of any person in performing functions of *that person's business.*" In addition, the PUPs exclude coverage for "any occurrence arising out of *a business or business property.*" (Joint Exhibit 7, p. 9.) (emphasis added). The policies define "business" as "any full or part-time activity of any kind engaged in for economic gain." (Joint Exhibit 7, p. 2.)

 Defendants argue that the PUPs' "business activities" exclusions do not apply because their service on the CCU Board of Directors constituted a "civic service" for which the PUPs expressly provide coverage. (Joint Exhibit 7, p. 4.) The PUPs require that a civic service be "a) not-for-profit; or b) not a function of an **insured's business.**"

The policies fail to further define the term "civic service." Defendants claim that CCU was a nonprofit organization and that their service was not a function of their respective businesses. Black's Law Dictionary defines "civic" as "pertaining to a city or citizen, or to citizenship." Courts have defined a credit union as "a democratically controlled, cooperative, nonprofit society organized for the purpose of encouraging *thrift and self-reliance among its members* by creating a source of credit at a fair and reasonable rate of interest in order to improve the *economic and social conditions of its members.*" *La Caisse Populaire Ste. Marie v. United States,* 563 F.2d 505, 509 (1st Cir.1977) (emphasis added). Similarly, under Rhode Island law, "the words 'credit union' shall mean a co-operative association formed for the purpose of promoting thrift among its members and offering opportunities for members to use and control their own money in order to improve their economic and social condition." R.I.Gen.Laws § 19–21–1 (1989).

Russo additionally argues that information he supplied on his PUP application gives rise to coverage for his activities in connection with CCU. A question on the PUP application form asked Russo to "[l]ist the public, educational, or charitable boards of which you or a resident of your household are a member of." In response, Russo listed his position as a member of CCU's Board of Directors. Under Rhode Island law, "[a]n application for insurance is ordinarily an offer which must be unconditionally accepted before a contract comes into existence." *Goucher v. John Hancock Mut. Life Ins. Co.,* 113 R.I. 672, 676, 324 A.2d 657, 660 (1974). Russo argues that, by accepting his application and issuing the PUP, Allstate accepted his offer and agreed to provide coverage in connection with his board position at CCU. Plaintiff notes, however, that the very beginning of the PUP provides that "Allstate agrees to provide the insurance *described in this policy.*" (Joint Exhibit 7, p. 2) (emphasis added). Accordingly, plaintiff argues that, on its face, the policy expressly limits coverage to the terms contained within the policy. Nothing in the policy incorporates the contents of the application into the policy itself.

In addition, Russo argues that the information contained in the application is evidence of the parties' intent to include coverage for his CCU board position in the insurance contract. Specifically, Russo stated that:

> [b]ased upon the questions asked in the application for the umbrella policy, my responses to those questions, and Allstate's silence in not informing me that my membership on the CCU Board of Directors would be excluded, I expected that I would receive full coverage for my position as a board member at CCU.

(Joint Exhibit 12, ¶ 11.) DiNapoli also claims that he expected the PUP to cover his activities in connection with CCU's Board of Directors. As a general rule, policy terms should be given their plain ordinary meaning. *Elliott Leases Cars, Inc. v. Quigley,* 118 R.I. 321, 325, 373 A.2d 810, 812 (1977). Only where there is sufficient doubt surrounding the meaning of a term should the court construe words in a policy in accord with "what the ordinary reader and purchaser would have understood them to mean." *Id.* The issue of whether defendants' service on CCU's board constituted a "civic service" appears to depend upon whether the term "civic service" is unambiguous and has plain meaning.

Allstate argues that because the claims against DiNapoli and Russo arise from their business activities with CCU, coverage is excluded. In support of its argument, Allstate cites *T.R. Krings v. Safeco Ins. Co.,* in which the Court of Appeals of Kansas examined a factual scenario nearly identical to that in this case. 6 Kan.App.2d 391, 628 P.2d 1071 (1981). In *T.R. Krings,* Mr. Krings served on the Board of Directors of the Kansas Savings and Loan Association for seven years from 1969 to 1976. *Id.* 628 P.2d at 1073. From 1972 to 1976, Krings received between $25 and $50 for each meeting he attended. *Id.* Krings also invested $320,000 in Kansas Savings and Loan Association common stock. *Id.* Krings resigned from the board in 1976 and the Kansas Savings and Loan Association went into receivership in the summer of 1977. *Id.* Five different

lawsuits named Krings as a defendant in connection with his activities at the Kansas Savings and Loan Association. *Id.* Krings, a lifetime worker in the insurance business, demanded defense of these lawsuits under both his homeowners and excess liability policies. *Id.* Krings failed to specify, in applying for either policy, "the perils against which he wanted to protect." *Id.* Defendant Safeco Insurance Company denied coverage and Krings filed suit against Safeco for failure to defend. *Id.* Safeco moved for summary judgment claiming that Krings' activities were excluded from coverage by the "business pursuits" exclusion contained in both policies. *Id.* The trial court granted Safeco's motion. *Id.*

The Kansas Court of Appeals upheld the trial court's grant of summary judgment for the defendant insurance company and adopted pertinent portions of the trial judge's memorandum opinion. *Id.* 628 P.2d at 1076. Applying the two-pronged test for "business pursuits" followed in the majority of jurisdictions, the court examined Krings' activities for 1) continuity, and 2) profit motive. *See id.* at 1074. The trial court found that the $25 to $50 Krings received per meeting was "direct compensation for his services." *Id.* Furthermore, the trial court determined that Krings "obviously hoped to manage the business in such a way so as to gain ... the greatest possible profit from his [$320,000] investment." *Id.* As a result, the court of appeals adopted the trial court's finding that "[Krings'] service on the Board of Directors at Kansas Savings and Loan Association was a regular activity engaged in with a profit motive." *Id.* The trial court also found that "a reasonable man ... would have understood the purposes of homeowners and excess insurance policies." *Id.* at 1075. Finally, the court attached significance to Krings' extensive knowledge of the insurance business. *Id.*

In reaching its conclusion, the *Krings* court found the reasoning of *Stern v. Insurance Co. of N.A.* persuasive. 62 N.J. 582, 303 A.2d 883 (1973). In *Stern,* the plaintiff claimed that compensation he received for his service on the Board of Directors of a local bank was an "honorarium." *See T.R.*

*Krings,* 628 P.2d at 1074. Unlike Krings, however, Stern had no money invested in the bank. Furthermore, Stern had served as a director for only nine months as opposed to Krings' seven years. *Id.* at 1075. Nevertheless, the New Jersey Supreme Court affirmed the lower courts' findings that Stern's service as an "outside" director constituted a business pursuit. *Id.* At least one other court has indicated that one who "holds a fiduciary position of responsibility, with its concomitant requirement of the rendition of services, ... [falls] within the 'business pursuit' ambit of a liability policy." *Shapiro v. Glens Falls Ins. Co.,* 47 A.D.2d 856, 858, 365 N.Y.S.2d 892, 897 (1975).

Defendants attempt to distinguish *T.R. Krings.* Both defendants argue that the monies they received for attending CCU Board meetings were a reimbursement of expenses and therefore not "economic gain." In support of this assertion, defendants cite R.I.Gen.Laws § 7-6-9. For the purpose of providing limited immunity from suit to "voluntary" directors of certain nonprofit corporations, Section 7-6-9 states that a "per meeting allowance, ... or reimbursement for out of pocket costs and expenses" is not "compensation." The PUPs provide that where a policy's terms conflict with a state statute, the state law controls. (Joint Exhibit 7, p. 3.)

DiNapoli further attempts to distinguish his case from *T.R. Krings* by pointing out that, unlike Krings, DiNapoli is not in the insurance business and owns no CCU stock. Russo asserts that, unlike Krings, he indicated "the perils against which he wanted to protect" in his application. *See T.R. Krings,* 628 P.2d at 1073. Russo also claims that the definition of business as a "trade, profession or occupation" in *T.R. Krings* is somehow broader than the PUP's definition of business as activity "engaged in for economic gain."

Thus court is mindful of the long and unique history of the Credit Union movement in Rhode Island. The beginnings of the movement certainly share some aspects of public service, providing a service to a population otherwise unable to enjoy the benefits of their financial services. The meager reimbursement, the lack of substantial compensa-

tion, the voluntary nature of the services of directors of credit unions all suggest an interest to assist an important segment of society without a business purpose. As developed in Rhode Island, participation as a director of a credit union is arguably a public service which might be considered to be a non business activity. These are vital state law issues of far reaching consequences which the highest court of the state will and should ultimately be called upon to determine. It is therefore thought appropriate to request the Rhode Island Supreme Court to make the determination of such important and unresolved issues.

Plaintiffs are directed to prepare and to present to the court within ten days a form of Order certifying the stipulation of parties concerning the facts, a copy of this opinion and the following questions:

III. The Questions.

Given this background, the court certifies to the Rhode Island Supreme Court the following questions:

1. Does the term "misrepresentation", as used in the Allstate Personal Umbrella Policies held by defendants, extend coverage for the claims of negligent and intentional misrepresentation made against defendants in the Master Compliant?

2. If the answer to question number 1 is yes, does the defendants' service on Central Credit Union Board of Directors constitute a "civic service" and not a "business" activity as those terms are used in the Allstate Personal Umbrella Policies held by defendants?

IV. Conclusion

Because no coverage exists under any of the provisions of the Homeowners Policies held by defendants Russo and DiNapoli, a judgment should enter declaring that Allstate is not obligated to defend or indemnify Russo or DiNapoli with respect to the allegations contained in the RISDIC Master Complaint under these policies. With respect to the Personal Umbrella Policies held by defendants, the court will certify the foregoing questions to the Rhode Island Supreme Court.